Syllabus.

## Margaret Brown

### v.

### Ellen Brown et al.

*Filed at Springfield November 2, 1892.*

| | |
|---|---|
| 142 | 409 |
| 147 | 214 |
| 142 | 409 |
| 153 | 304 |
| 142 | 409 |
| 164 | 122 |
| 164 | 373 |
| 142 | 409 |
| 93a | $^1$354 |
| 93a | $^2$356 |
| 142 | 409 |
| 195 | $^1$348 |
| 195 | $^4$350 |
| 100a | $^2$447 |
| 142 | 409 |
| 102a | $^1$ 37 |
| 142 | 409 |
| 200 | $^2$185 |

1. CONTRACT—*procured by fraud—voidable by party defrauded—his election final.* A contract into which one party has been induced to enter by the fraud or false representations of the other, is not necessarily void, but only voidable at the election of the defrauded party. He may, if he choose, abide by the contract, and hold the party guilty of the fraud to its performance ;—he is at liberty to disaffirm it, and if he seasonably elects so to do, and takes the steps necessary to work a rescission, the contract is no longer binding, and he is remitted to his original legal rights. But he can not do both, and having made his election he will be held to it.

2. SAME—*election to rescind for fraud—when it must be exercised.* An election to rescind a contract, if made at all, must be within a reasonable time after the party defrauded has obtained knowledge of the fraud. He must do so at the earliest practicable moment after the discovery of the fraud, or he will be taken to have affirmed the same. Four or five years after learning the facts is too late for the party to elect to rescind.

3. SAME—*whether a bill constitutes rescission—time of election to rescind.* The filing of a bill for the enforcement of a right over four years after a settlement of the complainant's claim, which fails to make any mention of the settlement, and which asks no relief against it, and makes no claim that the settlement was affected by fraud, is neither a rescission nor the manifestation of an intention to seek a rescission of the settlement.

4. Where a party sets up fraud in procuring a contract, for the first time, by an amendment to his bill, and asks to have the same rescinded, the time of the filing of the amended bill will, for the purpose of *laches*, be taken as the time of his election to avoid the contract for fraud.

5. SAME—*ratification after notice of fraud.* Where a party sells his interest in an estate consisting of lands as well as personal property, and takes notes for the deferred payments, if, after notice of a fraud practiced on him by the purchaser in respect of such sale, he receives payment of any of the notes, he will thereby ratify and confirm the contract, however fraudulent it may be as to the purchaser. And this will preclude a subsequent rescission.

6. MARRIAGE—*with a man who has a living undivorced wife is a nullity.* The marriage of a woman with a man who has a living, undivorced wife, is a nullity, and confers no rights. Without evidence of the death or divorce of the former wife there will be an entire failure to show that the second marriage is valid.

7. SAME—*competency of wife to prove marriage.* A woman is a competent witness to prove that she was married to a man, there being no record of such marriage required to be kept in the State where it is claimed to have taken place, and where the justice and all persons present at the ceremony are dead, so that she is neither corroborated nor contradicted. In such case, her testimony to the fact of marriage may be sufficient to establish the facts testified to by her.

APPEAL from the Circuit Court of McDonough county; the Hon. CHARLES J. SCOFIELD, Judge, presiding.

This was a bill in chancery, brought by Margaret Brown and Mary E. Kirk, against Ellen Brown, James A. Brown, Jr. and others, for the recovery of dower and for partition. The lands in which dower was claimed and which were sought to be partitioned were the following: The north-west quarter of section 17, the north-east quarter and the south-east quarter of section 18, and the west half of the north-east quarter and the north half of the north-west quarter of section 19, in township 7, north, of range 2, west, in McDonough county.

The original bill, which was filed July 31, 1890, alleged that, on the 20th day of August, 1885, James A. Brown died intestate, leaving him surviving Margaret Brown, his widow, and Mary E. Kirk and James A. Brown, Jr., his only legitimate children and heirs at law; that at the time of his death, he was the equitable owner of all of said land, he having bought the same and paid for it with his own money, and having had possession and control of the same up to and at the time of his death; that the legal title of only forty acres of said land, to-wit, the north-east quarter of the north-east quarter of said section 18, stood in his name at the time of his death, the legal title to the north-west quarter of said section 17 standing in the name of James A. Brown, Jr., and the

legal title of the residue of said land standing in the name of Ellen Brown; that James A. Brown bought the south-east quarter of said section 18 in 1867 of one Jackson and paid for the same with his own money, but had said land conveyed to Ellen Brown; that James A. Brown bought and paid for all the residue of said land and had the same conveyed to himself, and that he occupied, controlled, possessed and farmed all of said lands up to the time of his death.

Said bill further alleged that shortly prior to his death, James A. Brown entered into a fraudulent conspiracy with Frank L. Brown, a pretended son of his, and Ellen Brown, to divest himself of the title to all of said land and to vest the same in Ellen Brown, for the purpose of depriving the complainants of their just portion and interest therein; that in pursuance of such conspiracy, James A. Brown executed to Frank L. Brown his judgment note for $300, bearing date February 17, 1885, and due one day after date, and that on the 21st day of February, 1885, Frank L. Brown caused a judgment to be entered on said note in the Circuit Court of McDonough county for said sum of $300 and costs, and had execution issued thereon, and that by virtue of said execution, all of said lands, except the south-east quarter of said section 18 was levied on and sold, and that in pursuance of such sale, the sheriff of McDonough county, on the 9th day of May, 1885, executed to Frank L. Brown a deed conveying said lands to him; that on the 11th day of May, 1885, Frank L. Brown and wife executed to Ellen Brown a deed conveying to her all of said lands except the north-west quarter of section 17, and that on the 19th day of May, 1885, Frank L. Brown and wife conveyed that tract to James A. Brown, Jr.; that at the time of the execution of said promissory note, James A. Brown was not indebted to Frank L. Brown said sum of $300 or any other sum, and that said note was wholly without consideration, and that said conveyances from Frank L. Brown and wife to Ellen Brown and to James A. Brown,

Jr., were also without consideration; that at the time of said transactions, James A. Brown was in failing health, and that said transactions were all had for the purpose of defrauding the complainants out of their interest in said lands, in case of his death; that said lands are reasonably worth not less than $50 per acre, and that the amount bid therefor was grossly inadequate; that said conveyances were, therefore, fraudulent and void, and that James A. Brown, at the time of his death, was the real owner of said lands.

The bill claimed that, by reason of the premises, Margaret Brown, as the lawful widow of James A. Brown, was entitled to dower in all of said lands, and that Mary E. Kirk and James A. Brown, Jr., as the only legitimate children and heirs at law of James A. Brown, were entitled, as tenants in common, to said lands, subject to said dower. Various other persons were made parties defendant to the bill on the allegation that they claimed some interest in said lands, and the bill prayed that said sheriff's deed to Frank L. Brown, and the deeds from Frank L. Brown and wife to Ellen Brown and to James A. Brown, Jr., be cancelled and set aside, and that the dower of Margaret Brown in said lands be set off to her, and that said lands be partitioned between Mary E. Kirk and James A. Brown, Jr., according to their interests therein.

The Connecticut Mutual Life Insurance Company, one of the defendants, answered, setting up an interest in said premises by virtue of a mortgage thereon for $6000 bearing date January 7, 1886, executed by Ellen Brown and Frank L. Brown, conveying the west half of the north-east quarter and the north half of the north-west quarter of said section 19, and the south-east quarter of the north-east quarter of said section 18, said mortgage being given by way of renewal or extension of a mortgage for the same amount, executed January 7, 1881, by James A. Brown to the Ætna Life Insurance Company.

Among the defendants named in the bill were the children of Ellen Brown, ten in number, and Ellen Brown and her said children answered, admitting the death of James A. Brown as alleged in the bill, and that he was seizd of the north-east quarter of the north-east quarter of said section 18, and that the legal title of the other lands described in the bill, with the exception of the tract conveyed to James A. Brown, Jr., was in Ellen Brown. They deny that Margaret Brown is the widow, or that Mary E. Kirk and James A. Brown, Jr., are the only children and heirs at law of James A. Brown deceased. They deny that James A. Brown was the real owner of said lands, except the forty acre tract standing in his name, or that he bought them or paid for them with his own money. They deny that Ellen Brown, Frank L. Brown and James A. Brown, Jr., conspired to put the title to said lands out of James A. Brown, and also deny that Margaret Brown is entitled to dower in said lands.

The answer alleges that Ellen Brown bought the south-east quarter of said section 18 in 1867 with her own means, and that she has ever since that time been in possession thereof and paid the taxes thereon; that on the 21st day of September, 1883, Thomas Spence and others recovered a judgment against James A. Brown, in the Circuit Court of McDonough county, for $1,350; that on the 23d day of February, 1884, all of said lands were sold on an execution issued on said judgment, the judgment creditors becoming the purchasers, the sale being made subject to the lien of the $6,000 mortgage; that on the 17th day of February, 1885, James A. Brown being indebted to Frank L. Brown in the sum of $300, executed to him his judgment note for that sum, and that on the 21st day of February, 1885, judgment was entered on said note in favor of Frank L. Brown, and execution issued thereon, and that after the expiration of twelve months from said sale, Frank L. Brown caused his execution to be levied on said lands, and that he thereupon redeemed them from

said sale and caused them to be sold under his execution he becoming the purchaser and receiving a sheriff's deed therefor; that said proceedings to redeem were in good faith; that the title he thereby obtained was subject to the $6000 mortgage, and that he paid all the interest he acquired was reasonably worth; that he thereby became vested with a good title to said lands as against the complainants, and that it was no concern of theirs what disposition he subsequently made of said lands.

The answer further alleges that, after the death of James A. Brown, to-wit, on the 16th day of January, 1886, Ellen Brown and Margaret Brown adjusted and compromised the claims of Margaret Brown in the estate, real and personal, of James Brown, deceased, and that Ellen Brown then and there paid to Margaret Brown the sum of $1000, in full satisfaction of all her alleged interest in said lands and in said estate, and that Margaret Brown thereupon, in consideration thereof, released and conveyed to Ellen Brown all her right, title, claim and interest in said lands and said estate, and that by reason of such release and conveyance, Margaret Brown has no right or interest in said lands.

The answer also alleges that Ellen Brown is the true and lawful widow of James A. Brown, deceased, and as such was appointed administratrix of his estate, and as such administratrix, sold the north-east quarter of the north-east quarter of said section 18, under the order of the County Court of McDonough county to pay debts, and that William S. Brown became the purchaser thereof at such sale, and received an administratrix's deed therefor.

On the 12th day of May, 1891, by leave of the court the complainants filed an amendment to their bill, in which they alleged, in substance, that Margaret Brown and James A. Brown were married, February 8, 1849, in Butler county, Pennsylvania; that they lived together as husband and wife in Butler county for about nine years, during which time four

children were born to them two of whom died in infancy; that on or about the 1st day of April, 1858, James A. Brown left Margaret Brown and fled from the State of Pennsylvania; that during the period of about two years prior to his leaving, one Ellen Spence had been employed in his family as a servant; that when James A. Brown deserted Margaret Brown, he and Ellen Spence left the State of Pennsylvania together, and went from there to the State of Missouri, and after living in that State for a short time, they removed to the State of Illinois and settled in McDonough county, and resided together in that county until the death of James A. Brown; that during all that time they lived together as husband and wife and raised a large family of children; that James A. Brown and Ellen Spence were not married and never had been, but that Margaret Brown was during all that time his lawful wife; that James A. Brown, at the time he deserted his said wife, took from her her youngest living child, a boy then named Augustus Agnew Brown, but now known as James A. Brown, Jr.; that Margaret Brown, after her abandonment by James A. Brown, searched diligently for more than twenty years to find him and her son, but was unable to do so, until after the death of James A. Brown; that in the latter part of the year 1885 she learned for the first time the place of abode of her husband and son; that she then came to the county of McDonough and was preparing to enforce her rights and claim to dower in all the lands owned by James A. Brown in his lifetime, being the lands described in her original bill herein; that Ellen Spence, under the assumed name of Ellen Brown, was in the possession and control of substantially all of said lands, and claimed to own the same; that James A. Brown, at the time of his death, owned personal property worth $3000, and had large policies of insurance on his life payable to his wife, which said Ellen had collected.

The amended bill further alleged that when Margaret Brown was about to commence legal proceedings to enforce her rights, as the widow of James A. Brown, in his estate, Ellen Brown falsely claimed and stated, that James A. Brown had procured a legal divorce from said Margaret Brown many years prior to his death; that after said divorce had been procured, Ellen Spence and James A. Brown were legally married; that Ellen Brown was then the lawful widow of James A. Brown, and in law entitled to hold the widow's portion of his estate, as defined by the laws of the State of Illinois; that a copy of said decree of divorce was in the keeping and possession of one William Blakely some where in Pennsylvania; that Ellen Brown sent her duly authorized agent to Margaret Brown to represent and state to her that James A. Brown had procured a divorce from her, and that Ellen Brown had been lawfully married to said James A. Brown.

It was further alleged that said statements were and are false, and that James A. Brown was not and never had been divorced from Margaret Brown, and never had lawfully married Ellen Brown; that said false and fraudulent statements were made to said Margaret Brown for the wicked and corrupt purpose of inducing her to abandon her claim to a part of the estate of James A. Brown, deceased, as his widow; that Margaret Brown believed said statements as to said divorce proceedings and the subsequent marriage of James A. Brown and Ellen Brown, and that so believing, she agreed to and did take from Ellen Brown the sum of $1000 as and for her entire interest in the estate of James A. Brown, deceased, and executed to Ellen Brown quit-claim deeds and releases of all her interest in the lands and personal estate of James A. Brown.

It was alleged that said deeds and releases were obtained of Margaret Brown by means of said false and fraudulent statements of Ellen Brown; that the interest of Margaret Brown in said estate was and is worth more than $6000; and it is

therefore alleged that said quit-claim deeds and releases are fraudulent and void, and were obtained without adequate consideration. The complainants, by their amended bill, offered to repay to Ellen Brown said sum of $1000, with lawful interest thereon from the date at which the same was received, and made a tender of such payment, and prayed that said quit-claim deeds and releases be set aside and held for naught.

By a further amendment to the bill filed September 28, 1891, the complainants alleged that Margaret Brown first learned that said statements concerning said divorce were false some time after the payment to her of said sum of $1000, to-wit, in October, 1889.

The amendments to the bill were answered, and replications were duly filed. Prior to the hearing the bill was dismissed as to complainant Mary E. Kirk without prejudice. A hearing was then had as to complainant Margaret Brown on pleadings and proofs, resulting in a decree dismissing the bill as to her for want of equity. From that decree Margaret Brown has appealed to this court.

The facts, as shown by the evidence, are substantially these : James A. Brown, then known as James K. Brown, and Margaret Brown were married February 8, 1849, at Brownsdale, Butler county, Pennsylvania. Four children were born of this marriage, two of whom died while said parties were living together, the survivors being Mary E. Brown, now Mary E. Kirk, one of the complainants, and Augustus Agnew Brown, now known as James A. Brown Jr. During the years 1856 and 1857 Ellen Spence, who now calls herself Ellen Brown, was a servant in the family of said Brown, but left her service there, according to the testimony of Margaret Brown, in January, 1858, but according to her own testimony, before Thanksgiving day in 1857, which would be as early as sometime in November, 1857. After leaving said service she went first to the home of her mother some three miles away, and a few weeks later engaged in service in a millinery store

27—142 ILL.

in Pittsburg. The day she left, Brown took his said son, then a boy about three years old, to the house of his, Brown's father, alleging as a reason for so doing, that his wife, her servant being gone, could not do her work with her boy there. Brown continued to live with his wife until March 22, 1858, when he finally left her. Mrs. Brown saw her boy at the boy's grandfather's two or three times before her husband left. When Brown left, he took his boy to the house of William Blakely, his brother-in-law, who lived in Pittsburg, and there Mrs. Brown found him sometime the following July and took him away, carrying him to a hotel. There he was forcibly taken from her by three men, and she never saw or heard from either him or her husband until the latter part of the year 1885, and after the death of the latter.

According to the testimony of Ellen Brown, James A. Brown commenced making offers of marriage to her soon after she left his house, and as early as January, 1858. She says that she at first rejected his offers, but finally yielded to his repeated importunities, and in April following consented to marry him, he having assured her that he had obtained a divorce from the complainant, as the witness seems to have understood, without her knowledge, from some court in the State of Missouri. It was finally arranged that they should go to Jefferson City, Missouri, and be married there, and, as she testifies, they left Pennsylvania together April 6, 1858, and on April 9, on their arrival at Jefferson City, they went before a justice of the peace and were married. She swears that an hour or two before the marriage, Brown went out and procured a document which he exhibited to her, and which she says she read, and which, although she is unable to state its contents, she claims was a copy of a decree of divorce.

Brown and said Ellen thereafter lived together as husband and wife until his death, and reared a family of ten children. They first lived in Missouri, most of the time at Hamilton, until shortly after the breaking out of the late war, when they

removed to McDonough county, Illinois, where they lived until Brown's death, which took place at the date stated in the bill. The complainant insists that during all that time they took great pains to prevent their place of residence becoming known to the complainant, and there is evidence tending to support that contention, among the precautions taken being the change by Brown of his own name and that of his son, as above stated. James A. Brown Jr. was brought up in the belief that Ellen Brown was his mother, and he never learned the truth of the matter until he met the complainant in the early part of the year 1886, he then being about thirty years old.

The complainant lived several years in Pennsylvania after her husband deserted her, supporting herself and her daughter teaching school, and then removed to Kansas where she lived until she learned where her husband had been living about the last of the year 1885. During all this time she prosecuted many but fruitless inquiries for her husband and son, but was able to obtain no information as to their whereabouts until the date last mentioned. She then came to Monmouth, Illinois, and there met her son, who became convinced that she was really his mother, and who, on returning home, informed Ellen Brown of his discovery as to his parentage, and that his mother had put in an appearance and was about to insist upon her rights as the widow of James A. Brown, deceased.

The evidence tends to show that Ellen Brown was much disturbed at this intelligence, and implored James A. Brown Jr. to prevent his mother's coming down there and to settle the matter up if possible. She told him that she knew that his father had been divorced from his mother before she, said Ellen, married him; that said divorce was obtained at Jefferson City, Missouri, and that she had no doubt it could be produced if necessary. At her request, James A. Brown Jr. went with his half brother Frank L. Brown to consult her attorney, and said attorney's advice was, to tell Margaret Brown that there was a divorce, and that it could be produced. After

these conferences, James A. Brown Jr. went back to Monmouth and had another interview with his mother, in which he told her, as he testifies, that there was a divorce which was obtained at Jefferson City, and that it could be produced; that Ellen Brown and her family were disposed to fight the matter to the bitter end, and that in view of the fact that a divorce decree was in existence, the chances of a successful assertion by said Margaret of her claims were very poor. The testimony of Margaret Brown as to the representations made to her in relation to the divorce agrees substantially with that of her son, except as to the place where the decree was obtained, her recollection being, that he told her that the decree was obtained at St. Joseph shortly after her husband came to Missouri. She further testifies that she fully believed, from said representations, that a decree of divorce had been procured as stated, as she supposed that her son would not tell her so if it were not true; that she made the settlement with Ellen Brown and quit-claimed and released all her interest in her husband's estate relying upon the truth of the representations thus made to her, and that but for such statements she would not have made such settlement or executed said quit-claim deeds and releases. The date of said settlement was January 21, 1886. Of the $1000 agreed to be paid Margaret Brown as the consideration of said settlement, $100 was paid in cash, and for the residue she was given two promissory notes, one for $400, due April 1, 1886, and the other for $500, due July 1, 1886. These notes, as the evidence tends to show, were paid at maturity.

The further facts appearing from the evidence are sufficiently stated in the opinion of the court.

Messrs. PRENTISS, BAILY & HOLLY, for the appellant:

The marriage of a man and woman when one of them has a husband or wife living by a prior marriage, who is then liv-

ing and undivorced, is void, and not merely voidable. *Reeves* v. *Reeves*, 54 Ill. 332; *Cartwright* v. *McGown*, 121 id. 388.

If there was a divorce, the burden of proof to show that fact was upon the party alleging it. 1 Greenleaf on Evidence, sec. 79; *Railroad Co.* v. *Bacon*, 30 Ill. 347; *Harbaugh* v. *Monmouth*, 74 id. 367; *Cartwright* v. *McGown*, 121 id. 407.

Upon the question who was the lawful widow, we cite *Port* v. *Port*, 70 Ill. 484, and *Hebblethwaite* v. *Hepworth*, 98 id. 126.

Wherever one person misrepresents a material fact, that is, a fact which is subsequently the consideration of the contract, and which is peculiarly within his own knowledge, or uses a device which is calculated to induce the other party to forego inquiry into a material fact upon which the former has information, though such information be not exclusively within his reach, and it is shown that the concealment or other deception was practically with respect to the particular transaction, such transaction will be voidable, on the ground of fraud. 2 Chitty on Contracts, (11th Am. ed.) 1042; *Allen* v. *Hart*, 72 Ill. 104; *Higgins* v. *Bicknell*, 82 id. 502; *Hicks* v. *Stevens*, 121 id. 186.

Where one party has induced another to act on the faith of several representations made to him, any one of which he has made fraudulently, he can not set up the transactions by showing that every other representation was truly and honestly made. 2 Chitty on Contracts, (11th Am. ed.) 1043.

The liability of the principal for the agent's false or fraudulent representations rests upon the same ground as his liability for the other torts of the agent. For such false representations as he has expressly authorized, he is, of course, liable. But he is liable also for the agent's false or fraudulent representations made in the course of his employment and within the scope of his authority, although they were made without his knowledge or consent, or even in violation tion of his express instructions. Mechem on Agency, sec. 743, and notes; Chitty on Contracts, 1036, and notes.

The doctrine applicable to *laches* will not be applied where the Statute of Limitations has not fully run, unless it would be inequitable to grant the relief prayed for. *Stiger* v. *Bent*, 111 Ill. 328; *Linington* v. *Strong*, 107 id. 295.

Messrs. Sherman & Tunnicliff, for the appellees:

Every false affirmation is not a fraud. A knowledge of the falsity of the representation must rest with the party making it, and he must use some means to deceive. *Sims* v. *Klein*, Breese 302; *Railroad Co.* v. *Rice*, 85 Ill. 406; *Walker* v. *Hough*, 59 id. 375; *Babbit* v. *Dolten*, 14 Fed. Rep. 19; *Wheeler* v. *Randall*, 48 Ill. 182; *Fauntleroy* v. *Wilcox*, 80 id. 477.

To make false representations fraudulent, the party making them must have known them to be false. *Tone* v. *Wilcox*, 81 Ill. 529; *Grier* v. *Puterbaugh*, 108 id. 602; *Clement* v. *Boone*, 5 Ill. App. 109; Chitty on Contracts, 589; 1 Benjamin on Sales, 638; *Merwin* v. *Arbuckle*, 81 Ill. 501.

The right to disaffirm a contract for fraud must be exercised promptly after its discovery. *Hall* v. *Fullerton*, 69 Ill. 448; *Morey* v. *Pierce*, 14 Bradw. 95; *Carroll* v. *People*, 13 id. 213; 2 Parsons on Contracts (5th ed.), 780-782; *Vigus* v. *O'Bannon*, 118 Ill. 334; 2 Pomeroy's Eq. secs. 916, 965.

The delay in filing the bill is fatal to the relief sought. Pomeroy's Eq. Jur. sec. 917; 2 Story's Eq. Jur. sec. 1520; *Cunningham* v. *Fithian*, 2 Gilm. 650; *Rogers* v. *Higgins*, 57 Ill. 244; *Cox* v. *Montgomery*, 36 id. 396; *Hall* v. *Fullerton*, 69 id. 448. *McCarty* v. *Marlette*, 80 id. 526; *Carrol* v. *People*, 13 Bradw. 206; *Hunt* v. *Blanton*, 89 Ind. 38; *Williams* v. *Rhodes*, 81 Ill. 571.

Mr. Chief Justice Bailey delivered the opinion of the Court:

There is, in the present record, so far as we are able to discover, no evidence from which the court could properly find that James A. Brown was ever divorced from Margaret Brown, his first wife. Ellen Spence, now known as Ellen Brown, tes-

tifies that, before she agreed to marry him, she received assurances from him that he had obtained a decree of divorce from some court in the State of Missouri. On that assurance she accompanied him to Missouri with the expectation of being married to him there, and she testifies that a short time before the marriage ceremony was pronounced, he handed to her a document which he told her was a divorce decree, and that she took it and read it. She, however, is entirely unable to testify as to its contents, nor is there any other evidence as to the character or contents of said document, or whether it emanated from any court, or was authenticated in any manner as the record of a judicial proceeding. Here certainly is no evidence of a divorce decree, and there is an entire absence of any other competent evidence of any proceeding by which James A. Brown became freed from the bonds of his marriage with Margaret Brown.

That a marriage ceremony was pronounced by a justice of the peace of Jefferson City, Missouri, uniting James A. Brown in marriage with Ellen Spence is, as we think, shown by the evidence. She swears that such was the fact, and as the justice of the peace and all others, except her, who are shown to have been present at said ceremony are dead, her testimony is neither corroborated nor contradicted by that of any other witness. No record evidence of said marriage is produced, but the evidence shows that at that time the laws of Missouri required no record of marriages to be preserved. Ellen Brown is a competent witness, and her uncontradicted evidence, though standing alone, may be regarded as sufficient to establish the fact to which she testifies. But if James A. Brown had not been divorced from his former wife, she being still living, said marriage was a nullity, and as there is no proof of such divorce, there is an entire failure to show that said marriage was valid, or to establish the title of Ellen Brown to the legal position and rights of widow of James A. Brown.

The evidence is clear and positive that, at the time Margaret Brown quit-claimed and released to Ellen Brown her rights and interest in the estate of James A. Brown, as his widow, the representation was made to her by the agent of Ellen Brown, that her husband, prior to his marriage to Ellen Brown, obtained a divorce from her in some court in the State of Missouri, and that the evidence of such divorce was at hand and could be produced, and that Margaret Brown believed and relied upon such representation, and was thereby induced to transfer all her interest in said estate to Ellen Brown for the sum of $1000. She now claims that such representation was false and fraudulent, and she therefore offers to restore the consideration paid her with interest, and asks to have said settlement rescinded and the instruments by which she transferred her interest in said estate to Ellen Brown cancelled, so as to restore her to her former rights as the widow of James A. Brown, and to be granted a decree assigning her dower in the lands of which her husband was seized during the period of her coverture.

Two answers are made to the complainant's prayer for a rescission, 1. that the representation as to the existence of a divorce decree, whether true or false, was made by Ellen Brown in perfect good faith, and with a full belief on her part that it was true, and, 2. that even if said settlement was originally voidable at the instance of the complainant by reason of the alleged fraud, the complainant, by her delay in seeking a rescission, after acquiring knowledge of said fraud, has ratified the settlement, and should now be held to be barred of her right to rescind. As we view the case, it will be necessary for us to consider only the latter of these contentions.

The settlement was completed, and the instruments by which it was carried into effect were executed, January 21, 1886. The present suit was commenced by the filing of the original bill July 31, 1890. Up to that time the complainant had taken no steps to rescind, and had manifested no inten-

tion so to do. The bill as then filed made no mention of the settlement, asked no relief in respect to it, made no claim that any fraud had been practiced upon her, and no offer to restore the consideration received. It is manifest that the filing of said bill was neither a rescission nor the manifestation of an intention to seek a rescission by aid of a court of equity.

The answer to said bill having set up the conveyances and releases executed by way of carrying into effect said settlement, the complainant, by leave of the court, amended her bill, such amendment being filed May 12, 1891, which was five years and nearly four months after said settlement was made, in which she, for the first time, complained that she was induced to execute said conveyances and releases by fraud, and sought to have them rescinded. So far as is shown, her election to rescind was then for the first time made.

The evidence as to the precise point of time at which she first received knowledge of the falsity of the representations as to the divorce decree is not altogether clear, but we think it was sufficient to justify the Circuit Court in finding that, as a matter of fact, she acquired knowledge, or such notice as was equivalent to knowledge, that no such decree was in existence, within a short time after the settlement was consummated.

The evidence on this point is to be found mainly in the complainant's own testimony. She swears that the representation made to her was, that the divorce was obtained at St. Joseph, Missouri, and that shortly after the settlement was made, she caused the records at St. Joseph to be examined for the purpose of ascertaining whether there was any record there of the divorce proceedings, and that upon such examination no such record was found. When first on the stand, she stated that this examination was made within a week after the settlement, and she nowhere places it at a date later than the spring of 1886. She admits that the result of this examination caused her to suspect if not to believe that she had

been imposed upon and deceived in the matter. Notwithstanding this, she received at maturity and retained the amounts of the notes due April 1 and July 1, 1886, the first being so received by her, probably, and the second certainly, after she had learned the result of the examination of said records.

She further testifies that, sometime after the settlement, she had a conversation, in Kansas City, with a lawyer who had for sometime previously been a resident of McDonough county, Illinois, and who told her that Ellen Brown's attorneys had said to him, in substance, that they had no evidence whatever of the existence of any divorce decree, and that if they had had such evidence, they would not have given the complainant one cent. When first on the witness stand she fixed this conversation with said lawyer as having taken place four or five months after the settlement, and prior to the time she received payment of the last note, but on being recalled at a subsequent stage of the hearing, she stated that said conversation took place a year and half after the settlement, and long after both notes had been paid. It is to be observed, however, that she discloses no fact by which she can fix the date with any considerable degree of certainty, and when reexamined as to the precise date of said conversation, her reasons for fixing the date as she then did are not altogether satisfactory. This change in her testimony, made after the materiality of the date had become manifest, is necessarily attended with some degree of suspicion, and we are unable to say that the circuit judge who saw her and heard her testify on both occasions, was not justified in believing that the date at first fixed by her was the true one, and in finding that said conversation took place in the spring or early summer of the year 1886, and before the note maturing July 1, 1886, was paid.

The only other source of information as to whether there had been a divorce to which she lays claim, consists of a re-

mark by her son, made to her, as she says, in the fall of 1889, to the effect that there had been no divorce, but as it is not claimed, and as she had then no reason to suppose, that he had any special knowledge on the subject, that remark added little if anything to what she already well knew.

Taking her testimony most strongly in her own favor, and assuming that her conversation with the lawyer in Kansas City took place, as she stated when being examined the last time, a year and a half after the settlement was consummated, she was as well aware of the fraud practiced on her about four years before electing to rescind, as she was when she filed her amended bill. No excuse is shown for this long delay.

But the evidence warrants the conclusion that she was duly notified of the fraud before the contract was fully performed on the other side, and that with such notice, she elected to go on with it, and receive its full benefits. She at least was advised that no decree had been obtained at St. Joseph, and the representation made to her, as she swears, was the specific one that the divorce was procured at that place. According then to her own testimony as to which there is no discrepancy or dispute, she became thus early informed that the representation, as she understood it, was false. After receiving this information, instead of electing to rescind her contract, she proceeded to accept and appropriate its benefits, thus confirming and ratifying it.

The conversation with the Kansas city attorney, if it took place only four or five months after the settlement, as she testified when first examined, was only corroborative of what she had already learned, and gave her very satisfactory reasons for believing that the divorce story which had been told her was a fiction. With such information it was her duty to elect, especially as the contract was then partly executory on the other side, whether she would abide by or repudiate it, and having made her election, she was not at liberty to recede from it.

A contract into which one party has been induced to enter by the fraud or false representation of the other is not void, but only voidable at the election of the defrauded party. He may, if he chooses, abide by the contract and hold the party guilty of the fraud to its performance. But he is at liberty to disaffirm and repudiate it, and if he seasonably elects so to do and takes the steps necessary to work a rescission, the contract is no longer binding, and he is remitted to the same position and legal rights which he held before the fraud was perpetrated. But he is not permitted to do both, and having once made his election, either to affirm the contract or to rescind it, he must abide by such election, and can not afterward change his position in that respect.

The authorities all agree that an election to rescind, if made at all, must be made within a reasonable time after the defrauded party has obtained knowledge of the fraud. As was said in *Masson* v. *Bovet*, 1 Denio, 69 : "A person who is induced to part with his property on a fraudulent contract may, on discovering the fraud, avoid the contract and claim a return of what has been advanced upon it. Fraud destroys the contract *ab initio*, and the fraudulent purchaser has no title. But if the party defrauded would disaffirm the contract, he must do so at the earliest practicable moment after the discovery of the fraud. That is the time to make his election, and it must be done promptly and unreservedly. He must not hesitate ; nor can he be allowed to deal with the subject matter of the contract and afterwards rescind it. The election is with him ; but he may affirm or disaffirm the contract, but he can not do both ; and if he concludes to abide by it, as upon the whole advantageous, he shall not afterwards be permitted to question its validity."

In *Hall* v. *Fullerton*, 69 Ill., 448, a purchaser of land, a little more than five years after the contract of purchase was made, and a little more than four years after he was informed of the fraud complained of, sought to rescind the contract on

the ground of false representations as to the situation and location of the land purchased, and this court, adopting the rule and substantially the language above quoted from *Masson* v. *Bovet,* held that as the purchaser had made no attempt to rescind the contract until the day prior to filing his bill, he had slept too long on his rights, and could not then be permitted to rescind. To similar effect see, *Williams* v. *Ketchum,* 21 Wis. 432; *Manahan* v. *Noyes,* 52 N. H. 232; *Pratt* v. *Fiske,* 17 Cal. 380; *Barfield* v. *Price,* 40 id. 535; *Hunt* v. *Hardwick,* 68 Ga. 100; *Gates* v. *Bliss,* 43 Vt. 299; *M. & C. R. R. Co.* v. *Neighbors,* 51 Miss. 412; *Gould* v. *Cayuga County National Bank,* 86 N. Y. 75; *Shaw* v. *Barnhart,* 17 Ind. 183; *Fisher* v. *Wilson,* 18 id. 133; *Desha* v. *Robinson,* 17 Ark. 228; *Cook* v. *Gilman,* 34 N. H. 556; *Lawrence* v. *Dale,* 3 Johns. Ch. 23.

If we concur in the plaintiff's contention that she had no satisfactory information of the falsity of the representation made to her until she had said conversation with the lawyer at Kansas City, and that said conversation took place a year and a half after the execution of the conveyances now sought to be rescinded, she even then slept on her rights almost four years before attempting to rescind, and during that time, Ellen Brown and her sons, relying on said conveyances, expended large sums of money by way of clearing the lands in question of the mortgage to the insurance company and various other incumbrances thereon. We think, under these circumstances, it is now too late for the complainant to be permitted to rescind.

But the decree of the Circuit Court rests upon the stronger ground of ratification. The evidence, as has already been shown, warrants the conclusion that the complainant was notified of the falsity of said representation before the consideration for her quit-claim deeds had been fully paid. At that time one-half of said consideration or $500 was not yet due. With such notice, she received and afterward retained

said $500, and her doing so was clearly a ratification. The contract being partly executory on the other side at the time she was advised of the fraud, she was in duty bound to make her election at once, or at least before requiring further performance by the other party. She was not at liberty to insist upon the validity of the contract until fully performed, and then shift her position and rescind. Accepting the residue of the consideration with knowledge of the fraud was a ratification which precluded a subsequent rescission.

We are of the opinion that the decree is sustained by the evidence, and it will therefore be affirmed.

*Decree affirmed.*