# BLEMA BRAGER

*vs.*

## JACOB H. FRIEDENWALD ET AL.

*Deceit: action of——. Contract induced by fraud: rights of party to repudiate——; or sue for damages. Constructive knowledge of agents. Prayer taking case from jury: sufficiency and weight of evidence.*

In passing upon a prayer to withdraw the case from the consideration of the jury, the only question for the judge to decide is whether the plaintiff has offered any evidence legally sufficient to sustain the declaration.     p. 10

If there is any evidence legally sufficient for that purpose it is the exclusive duty and province of the jury to say, when all the facts have been submitted to them, whether they have sufficient probative force to sustain the plaintiff's case.     pp. 10-11

In passing upon such a prayer, the Court must assume the truth of all the plaintiff's evidence.     p. 11

Where there is a conflict of evidence upon a vital question of fact it is for the jury and not for the court to decide.     p. 12

Where a prayer withdrawing a case from the consideration of the jury makes no reference to the pleadings,—the Court, on appeal, is not concerned with any question of variance between the declaration and the evidence.     p. 29

One who is induced to sign a contract by the deceit of the other party, is bound thereby neither in law nor in equity; such an instrument is voidable, and without regard to any question of fraud, it may be rescinded or repudiated.     p. 29

Where one of the parties to an agreement is under no legal obligation to speak, his mere silence or mere non-disclosure of material facts will not be sufficient to form the basis of an action of deceit; but if he makes some mis-statement of fact, or such

a partial or fragmentary statement as to mislead the other party—to the latter's injury—such action will lie.          p. 32

The existing intention of a party at the time of contracting is a matter of fact, and may be material to the validity of a contract; if it be proved that a person falsely represented his intention at the time of making a contract, for the purpose of inducing its execution, it may be ground for avoiding the contract.

p. 33

Where a contract was induced by deceit, the party so deceived may repudiate the contract, or may sue for damages sustained by reason of the deceit practiced.          p. 34

In actions of deceit the knowledge of the principals may be imputed to the agents through whom the negotiations were conducted.          pp. 30-31

*Decided March 2nd, 1916.*

Appeal from the Superior Court of Baltimore City. (DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, URNER, PATTISON, STOCKBRIDGE and CONSTABLE, JJ.

*Randolph Barton, Jr.,* and *Wm. L. Marbury* (with whom were *Randolph Barton* and *T. Scott Offutt* on the brief), for the appellant.

*Vernon Cook, Charles Markell* and *Martin Lehmayer,* for the appellees.

BURKE, J., delivered the opinion of the Court.

At the conclusion of the argument of this case the duty of preparing the opinion devolved upon JUDGE STOCKBRIDGE. He prepared and submitted an opinion, but a difference arose among the judges as to the conclusion which should be reached upon the question presented by the record, and the opinion was not adopted.   But this diversity of opinion does not

arise over the principles of law applicable to actions of this character, but it arises out of a difference of understanding as to the legal purport and effect of the facts contained in the record. This opinion expresses the views of the majority of the Court.

Upon the conclusion of the plaintiff's case the Court instructed the jury to find their verdict for the defendants upon the ground that there was no evidence in the case legally sufficient to entitle the plaintiff to recover. In obedience to this instruction, the jury found their verdict for the defendants. A judgment was entered on the verdict in favor of the defendants and the plaintiff has brought this appeal.

The record contains seven bills of exceptions. Six of them were reserved by the plaintiff to rulings of the Court on questions of evidence, and the other to the granting of the prayer referred to by which the case was withdrawn from the consideration of the jury. As the only important question in the case arises over the granting of that prayer, that question will be first considered.

It is important to bear in mind that in deciding the question of the propriety of granting that prayer we do not decide whether or not the evidence is sufficient to support the plaintiff's case against any, or all of the defendants. We do not decide, or express any opinion as to whether it is or not, and we are not to be understood as expressing or intimating any opinion upon the credibility of witnesses, or upon the truth of the evidence. In our system of jurisprudence the province of the jury is separate and distinct from that of the Court. When a prayer, such as we have in this case, is submitted to withdraw a case from the jury, the only question the judge can decide upon such an application is whether the plaintiff has offered any evidence legally sufficient to sustain the cause of action. If there is any evidence legally sufficient for that purpose, it is the exclusive duty and province of the jury to say, when all the facts have been submitted to them, whether they are of sufficient probative force to support the

plaintiff's case. In passing upon the propriety of granting this prayer the evidence adduced by the plaintiff in support of her case must be assumed to be true, and she must be given the benefit of all legitimate and fair inferences deducible therefrom in her favor. So the real question before us on this prayer is, not whether the testimony offered proved the plaintiff's case, or whether the jury ought to have so decided had the case been submitted to them, but whether there was any legally sufficient evidence offered by the plaintiff from which the jury could properly find, if they believed it true, that the defendants were guilty of the wrongs alleged in the declaration. This principle, it is true, is elementary, but it is well at times for our guidance to recur to and restate fundamental principles.

There is one circumstance to which it is proper to refer before proceeding to a discussion of the main facts. The plaintiff called Leo, Jacob and Moses Friedenwald and proved by them that they, and at least two of the defendants, had personal knowledge that the will of 1903, hereafter more particularly referred to, was obtained by the grossest sort of undue influence exerted upon Mr. Friedenwald. Upon cross-examination these witnesses testified that Albert A. Brager, the husband of the plaintiff, and who was acting as her agent and representative throughout the entire negotiations and litigation connected with this estate, was told by them of the exercise of this undue influence before the attack on the 1903 will; that he was informed of all they knew upon the subject. This was denied by Mr. Brager, who testified that he did not know of the specific acts of undue influence until long after both settlements hereafter mentioned were made, and not until these witnesses had testified to this undue influence at the trial of the caveat to the will of 1903. One of these witnesses, Jacob H. Friedenwald, was a party to this suit, and the plaintiff was not bound by his testimony, and it was competent for her to show what the real facts were, notwithstanding the testimony of the other witnesses.

There was a conflict of evidence upon a vital question of fact which it was for the jury, and not for the Court, to decide.

The record is large, and, without prolonging this opinion by a minute and tedious discussion of the evidence, we will give a brief outline of such facts appearing in the record, which in our opinion, should have carried the case to the jury.

Joseph Friedenwald, who was about eighty-four years of age, died in Baltimore City on December 24, 1910. His wife had predeceased him. He left surviving him twelve children and three grandchildren, the children of a deceased daughter, Rebecca Bloch. These surviving children and grandchildren were his heirs at law and distributees. These children in this opinion will be treated as constituting one of the surviving children of Mr. Friedenwald. Mr. Friedenwald was a wealthy man—the exact value of his estate does not appear from this record, but it was probably as much as four millions of dollars. Had he died intestate, each of the surviving twelve children would have taken a one-thirteenth part of his estate, and the above named children of his deceased daughter would have taken the other one-thirteenth part of this vast estate. According to the evidence of Jacob H. Friedenwald, one of the defendants, and of Moses S. Friedenwald, another son, it was the fixed intention of Mr. Friedenwald that his estate should be equally divided among his children. In testifying as to the occasion of the fiftieth anniversary (February 14, 1902) of the marriage of his father and mother, Jacob H. Friedenwald, said: "We presented my father with a loving cup, with each and every one of the children's pictures around and father's and mother's picture in the center. My father made a few remarks, telling us what good children he had, what fine children he had; that he wanted us to stick together, be one big family, congenial, and that he dearly loved all his children, and at that time he said he was going to divide his worldly possessions equally

among all his children." Speaking of the fifty-first wedding anniversary, Moses S. Friedenwald said: "My father, as was usually his custom in these gatherings of his children—it was the fifty-first anniversary of the marriage of my mother and father, and all the children were congregated there, and he was seated at the table and he made a few remarks addressed to his children; that he had a very large family, all very near and dear to him; that he had arrived at that age in life where he was not very long for this earth; that he had accumulated quite a large fortune; that it was his intention to make an equal distribution amongst all his children; that they were all alike to him; that he did not have any difference, did not see any difference, and when he was dead and gone he wanted them all to be a great big chain with no weak link in it." This testimony is not contradicted, and was given at a time when, as the evidence tends to show there was a concerted action to strike down the will of 1903, and thus secure a distribution of the estate upon the basis of intestacy. The attack upon the will of 1903 was successful, and the estate has been distributed as if Mr. Friedenwald had died without a will, but in this distribution the plaintiff has been excluded.

The children and heirs at law of Mr. Friedenwald were: Benjamin B. Friedenwald, Hiram W. Friedenwald, Jennie Hecht, Merla Thalheimer, Bertha Goldenberg, Berleen Dessauer, Aimee Beekman; Herbert Block, Merla Block Wolf, Helen Bloch Shields, children of Rebecca Bloch, a deceased daughter.

These are referred to in the Record as the "favored eight," and will be so designated in this opinion.

The remaining children are Blema Brager, the appellant; Moses S. Friedenwald, Jacob H. Friedenwald, Leo Friedenwald, Florence Selz. The four last named are spoken of as "the four," and will be so referred to in this opinion.

After the death of Mr. Friedenwald, it was discovered that he had made and executed at various times three instruments of writing purporting to be last wills and testaments:

(*a*) One dated August 3, 1875. By its terms all the estate of the testator was left to his wife absolutely in case she survived him. As Mrs. Friedenwald died before her husband, and as the will made no alternative provision as to the property, it is conceded that her children took nothing under that will, and it need not be further noticed.

(*b*) One dated April 24, 1903. (1) By the terms of this will the whole estate was left in trust for the widow for life, and then in further trust to pay various legacies, including one thousand dollars to each child of Blema Brager. (2) Twenty thousand dollars in trust for life for Florence Selz, a daughter. (3) Balance in trust for twenty-one years with limitation as to the income, and upon the expiration of the trust period the trustees were directed "to pay over and divide the said trust estate and all accretions and accumulations to and among such of my children and descendants of deceased children as may be living at the expiration of said twenty-one years, in equal shares *per stirpes*," except Mrs. Brager and Mrs. Selz. *Mrs. Brager was excluded by this will.*

(*c*) One dated December 12, 1910. By the terms of this will his estate was disposed of as follows:

(1) Various legacies.

(2) Specific devises of certain real estate.

(3) All his shares in the Crown Cork and Seal Company in trust for two sons and six daughters—"the favored eight," mentioned above, and upon the expiration of the trust period "to divide and transfer said shares and all invested and accumulated income in equal shares to my two sons, Benjamin B. Friedenwald and Hiram W. Friedenwald, and my six daughters, Jennie Hecht, Merlie Thalheimer, Bertha Goldenberg, Berline Dessauer, Amie Beekman and Rebecca Bloch, their personal representatives and assigns, absolutely and free from all trusts."

(4) Forty thousand dollars to Mrs. Brager.

(5) All the rest and residue of the estate is divided into twelve parts—one share is given to each of the "favored

eight," absolutely, and one share each is placed in trust for life for "the four," viz: Moses S., Jacob H. and Leo Friedenwald, and Florence Selz. The will contained a clause annulling the bequest to any one who should contest it. The executors named in the will of 1903 were Hiram W., Jacob H. and Benjamin B. Friedenwald. In the will of 1910 the executors named were his sons, Benjamin B. and Hiram W. Friedenwald, and sons-in-law, Samuel Thalheimer, Milton Beckman and Leonard Hecht.

The provisions of the 1910 will became known shortly after Mr. Friedenwald's death. In consequence of the gross inequality of its dispositions there was great disappointment and dissatisfaction on the part of Mrs. Brager and "the four." It is not disputed that Mrs. Brager and Mrs. Selz had always been affectionate and dutiful children, and the evidence is clear and uncontradicted that their father had always been devotedly attached to them. Mrs. Selz's husband had been unfortunate in business and had gone to New York to seek employment. She and her two children went to her father's home where they remained about one year. She then joined her husband in New York, and lived in a tenement district in great poverty and privation. Her situation excited the sympathy of her father and he sent her money for her support, and repeatedly declared his intention to provide for her. But by the terms of the will the "favored eight" received each about three hundred thousand dollars of his estate, and Mrs. Brager was given forty thousand dollars, and Mrs. Selz was given an income for life of probably six thousand dollars.

Mrs. Brager has been in poor health for a number of years and she committed her interests to the charge of her husband who was a successful and well-known business man. He determined on behalf of his wife to contest the will, and immediately began to collect evidence upon which to base a contest. Three of "the four" wanted the will stricken down, but it was recognized that this meant a long and expensive litigation. The *in-terrorem* clause in the will and the financial

inability of either of "the four" to carry on the litigation operated as restraints upon them, but all, except perhaps Leo, wanted to contest the will, and Mr. Brager determined to begin the contest. The will had been admitted to probate in the Orphans' Court of Baltimore County on December 28, 1910—four days after Mr. Friedenwald's death.

"The eight" determined to prevent this contest by getting Mrs. Brager out of the way. With her out of the way, they thought there would be no further trouble. They did get her out of the way—and it was thought finally and effectually—in the following manner: In January, 1911, a meeting between Mr. Edwin G. Baetjer, Mr. Brager and Mr. Louis N. Frank, counsel for Mr. Brager, was held at the home of Mr. Brager. At this meeting Mr. Baetjer was representing "the eight." At this meeting he made no intentionally false statements, nor did he make any statements which he did not in good faith believe to be true. But what he did say in the light of subsequent developments materially and injuriously affected the rights of Mrs. Brager in her father's estate. Mr. Baetjer was there to get rid of the impending war on the will. He talked peace. He acted like a trained and skilled diplomat seeking to remove the causes of strife. The greater part of the interview seems to have been taken up in discussing that wonderful man,—and in many respects he was a wonderful man,—Joseph Friedenwald,—his personal characteristics and abilities. Finally, Mr. Baetjer told Mr. Brager that there was an earlier will which was less favorable to Mrs. Brager than the will of 1910, and that Hiram W. Friedenwald, one of the executors of the 1910 will had told him the maximum amount that each child would receive would be one hundred and ten thousand dollars. There can not be a doubt upon this record that the statements of Mr. Baetjer were relied upon by Mr. Brager; that they led him to believe in the existence of a valid prior will less favorable to Mrs. Brager, and that the existence of such a will and the maximum amount to each child stated by the

executor,—both of which representations proved to be untrue, —were the inducing causes of the settlement to which we shall presently refer. Mr. Brager in referring to the statements made by Mr. Baetjer as to an earlier will, which proved to be the will of 1903, said: "The Court: Can you recollect the language that Mr. Baetjer used when he announced the 1903 will? A. He simply told me he had another will; he found another will or had another will, I cannot give his exact language; on his desk or in his desk, or among his papers; further than that I could not give you the definite language. Q. You say, he said you are up against a stone wall as to the other will; are those his words? A. I think those were the words if I remember them now, I have repeated it so often that they have become fixed in my mind; because I recall that he said I was against a stone wall as far as I can recall this minute. Q. You are speaking in reference to the 1903 will and was he? A. He didn't say 1903 will as I remember; he said former will. Q. What other language, if you can recall, did he use, or did he characterize in any way this former will which he told you about? A. He said this: in this other will that Mrs. Brager would not fare quite so well as she did in the 1910 will; I did not find out until very much later that the 1903 will did not leave Mrs. Brager anything. I believe Mr. Baetjer thought he was absolutely right; I do not think he tried to mislead me, as far as I know; I believe he thought it left Mrs. Brager less, as he stated; but as a matter of fact Mrs. Brager was entirely eliminated in the will of 1903. Q. I want you to give, if you can state it to me, the precise language that Mr. Baetjer used when he brought to your attention the difficulty that you would be up against, after breaking the 1910 will, by reason of this former will, which you say for the first time he told you about at this interview? A. Well, he told me I would be up against—the spirit of it was I was up against an impossible proposition."

Following this interview a settlement was made between Mrs. Brager and "the eight," and all the papers relating to

this settlement were prepared by Mr. Baetjer. This settlement was made to protect the will of 1910 from attack; to compose differences and prevent family dissentions, but primarily to avoid the contest over that will which Mrs. Brager was threatening to inaugurate. The executors agreed to pay her the sum of eighty-five thousand dollars, that is to say, the legacy of forty thousand dollars, and forty-five thousand dollars additional, and it was agreed "that said additional amount of forty-five thousand dollars is not to be paid by or contributed to by all of the legatees and devisees under said will, but is to be paid equally by the eight parties entitled to the benefit of the bequests of the stock of the Crown Cork and Seal Securities Company, etc., by the eighth item of said will, that is to say, the three children of Rebecca Bloch to represent their mother's share, and to pay together one-eighth, and each of the remaining parties to pay one-eighth of said sum." In pursuance of the agreement of settlement Mr. and Mrs. Brager on March 21, 1911, executed a deed granting and conveying all the right, title, interest and estate of Mrs Brager in and to all the property and estate, real, personal and mixed, of which Joseph Friedenwald was, at the time of his death seized or possessed, or in any way entitled to, and including all rights, title, interest and estate which the said Blema Brager may have as legatee or devisee under said will or under any other will, and as heir at law or distributee of the said Joseph Friedenwald, unto and to the following persons, to wit:

(1) To the pecuniary legatees and to the devisees mentioned in items one to seven included in the said will, the amounts of their said legacies and property devised by them, respectively, to be held by them free from all claim of the said Blema Brager.

(2) To the Safe Deposit and Trust Company of Baltimore, trustee, under the eighth item of said will, the shares of stock of the Crown Cork and Seal Securities Company and the Crown Cork and Seal Company of Baltimore in

trust to hold the same as herein set forth, and on the arrival of the time provided therefor, to divide the same and all accumulated income thereon as follows, to wit: To Benjamin B. Friedenwald, Hiram W. Friedenwald, Jennie F. Hecht, Merla Thalheimer, Bertha Goldenberg, Berleen I. F. Dessauer and Aimee F. Beekman each one-eighth thereof and Herbert R. Bloch, Helen B. Shields and Merla B. Wolf, children of Rebecca Bloch, the remaining one-eighth.

(3) As to all the rest and residue of the property whereof the said Joseph Friedenwald died seized or possessed, and all the interest and estate of the said Blema Brager therein, to the Safe Deposit and Trust Company of Baltimore, trustee under the eleventh item of said will, four-twelfths thereof.

(4) To William B. Friedenwald, Hiram W. Friedenwald, Jennie F. Hecht, Merla Thalheimer, Bertha Goldenberg, Berleen I. F. Dessauer and Aimee Beekman each one-twelfth thereof; and Herbert Bloch, Helen B. Shields and Merla B. Wolf, children of Rebecca Bloch one-twelfth thereof. The money was paid on the 21st of March, 1911.

Out of this sum it was agreed that Mr. Frank should receive as an attorney's fee $5,000. Mr. Brager was asked why he made this settlement. He replied: "I thought it was the right thing to do. Mrs. Brager in that way would get eighty thousand dollars, and if the original will stood she would get this forty thousand dollars, and if I contested it and won I would only get one hundred and ten thousand dollars, and I believed the difference between eighty thousand dollars and one hundred and ten thousand dollars would be almost expended in lawyers' fees and Court costs, etc., even if I won out, and I felt it was the wisest thing to do, and then besides, I made the allusion to Mr. Baetjer, a fact which I want to tell you and which I had forgotten, I told him I would regret very much if there would be any family friction, and I made a point of this statement, that if there was a settlement of any character, and that was discussed that night between Mr. Baetjer and Mr. Frank and myself that pleasant relations would continue between the family

and Mrs. Brager. "Q. What was your understanding or belief about this earlier will when you made this statement? A. I believed that any instrument that Mr. Joseph Friedenwald had executed in 1903 would be incontestable."

Mr. Frank testified: "I talked the matter over with Mr. Brager; I knew the law of this State regarding the breaking of a will, which is a very solemn instrument, and I thought we would have a great deal of difficulty, I knew it would mean a big fight because we had practically the whole family arrayed against us, the other-eight; under the terms of that will the Crown Cork and Seal Company's stock was tied up in some way advantageous to the Crown Cork and Seal Company and I knew or felt we would have to contend with the assistance of the Crown Cork and Seal Company who would assist in sustaining the will, which really occurred; I also took into consideration the fact there was another will, and if we succeeded in breaking the will of 1910 which as I said before, was a government job,—if we broke it I knew it was staring me in the face. I thought even if we broke the 1910 will we would have to fight the 1903 will, and I thought it would be a tremendous undertaking."

After this settlement had been consummated the situation which presented itself is thus described in one of the briefs of the appellees: "The captain had deserted the ship. For a time the crew seemed to be in a state of consternation. Leo and Florence, who were in immediate need of money, accepted allowances under the will which would have precluded them from attacking it. Jacob and Moses hesitated. They had large interests under the will, to wit: A life income for each of probably about six thousand dollars a year, all of which they would lose in event of an unsuccessful litigation. Finally, Mr. Harley, on being satisfied as to the testimony which Doctor Julius Friedenwald would give, advised Moses to file a caveat, which was accordingly done on May 24, 1911. This caveat contained all the usual allegations as to lack of testamentary capacity, undue influence, fraud and knowledge of the contents of the will."

A long and bitter contest ensued between Moses S. Friedenwald, the caveator, supported by three of "the four," aided by Mr. Brager, to strike down the will of 1910, and the "favored eight" who were seeking to uphold it. On January 30, 1912, the will was broken upon the ground of mental incapacity,—the issues of undue influence and fraud being withdrawn from the consideration of the jury. The probate of the will was revoked by the Orphans' Court.

A new chapter in the story of this litigation then began. It is one which we think the jury should consider and characterize. An appeal was entered from the rulings of the Court taken during the trial, but no bills of exceptions were prepared, and the time within which the appeal could be prosecuted was permitted to expire. The breaking of the 1910 will left in force the will of 1903. With this will none of the twelve heirs were satisfied. It had disinherited Mrs. Brager, who, however, was supposed to have no further interest in the estate, and it had practically disinherited Mrs. Selz, and it tied up the estate in a long trust. It was determined to get rid of this will. The first step taken to this end was this: The twelve heirs,—"the four" and "the eight,"—got together on that proposition. Upon what ground was the will to be stricken down? If the testimony of Leo, Jacob H. and Moses S. Friedenwald be true,—and for the purposes of this case we must assume it to be true,—they and Mrs. Hecht and Mrs. Dessauer knew of their own personal knowledge that that will was a mere shadow,—that it had been obtained by the most unnatural and grossest undue influence practiced upon Mr. Friedenwald, and for that reason could be easily and readily set aside. According to the testimony of Mr. Brager, all five of these parties kept this evidence,—which is set out in full in the record,—securely locked in their own breasts until the trial of the caveat to the will of 1903 and after the second settlement had been made. It is not pretended that they mentioned it to Mr. Barton. In the intervening period between the breaking of the will of 1910 and

the filing of the caveat to the will of 1903, Mr. Harley, Judge
Lehmayer and Mr. Frank were representing "the four," and
the late Edgar H. Gans the "favored eight." Mr. Frank
said "we were trying to get the family together." He knew
that efforts were being made in such a way that there might
be a distribution. That that distribution was to be made upon
terms of perfect equality between "the four" and "the favored
eight" is obvious from the record. On January 9, 1913, "the
four" filed a petition and caveat to the will of 1903, and
before the issues upon that caveat were tried all the parties
had come to an agreement even as to the interest of Mrs.
Brager, conveyed by the deed of March 21, 1911. This
deed had conveyed her interests subject to the trust created
by the will of 1910. But the twelve had agreed to divide it
equally among themselves.

A singular thing happened in May, 1912. Mr. Jacob A.
Rice, who is called in the testimony "a magician," approached
Mr. and Mrs. Brager and procured from them a power of
attorney. The power of attorney contained this recital:
"And whereas the said Moses S. Friedenwald, together with
Jacob H. Friedenwald, Leo Friedenwald, Florence Selz,
have signified to the said Blema Brager and Albert A. Brager
that none of them would make any attempt to attack or break
the said alleged will of 1903 unless the said Blema Brager,
Albert A. Brager, her husband, and the said children of
Blema Brager, who are legatees under the alleged will of
Joseph Friedenwald of 1903, would execute to Jacob A. Rice,
who is acting under power of attorney for the said Moses S.
Friedenwald, Jacob H. Friedenwald, Leo Friedenwald and
Florence Selz, in securing their share of the estate of said
Joseph Friedenwald, a full, final and irrevocable power of
attorney to the said Jacob A. Rice as hereinafter set forth."
This instrument invested Mr. Rice with the broadest powers.
It contained a stipulation that the Bragers would not, either
jointly or severally, at any time or times thereafter "insti-
tute any action, suit, or proceeding, either in law or in equity

of any kind, or character whatsoever, for the purpose of
recovering or receiving anything from the estate of Joseph
Friedenwald, deceased, or for the purpose of attacking any
proceeding which may be instituted of any character what-
soever, by any of the heirs, distributees or legatees of the
estate of said Joseph Friedenwald; and we hereby authorize
our said attorney to execute any and all deeds, releases, cove-
nants and other assurances of any character whatsoever,
conveying whatever interest we or any of us may have in
and to any part or portion of the estate of said Joseph
Friedenwald under any will or testament, or as heir, devisee,
legatee, or in any other manner whatsoever, as fully, finally
and effectually as we could personally do in the premises,
hereby finally ratifying and confirming whatsoever our said
attorneys may do for us in the premises."

Under this power of attorney Rice collected from the
estate the legacies of the Brager children under the will of
1903.    After the twelve heirs had reached an agreement as
to the distribution of the entire estate among themselves in
equal proportions, the will was offered for probate in the
Orphans' Court of Baltimore County on January 9, 1913,
in the presence of counsel of all the parties.    At the same
time a petition and caveat was filed by "the four," and the
answer of "the favored eight" was filed.    The answer, after
denying the allegations of mental incapacity, undue influence,
fraud, etc., averred in the petition, contained this paragraph:
"These respondents further say that the said Joseph Frieden-
wald left what purported to be a last will and testament dated
the 12th day of December, 1910, which was probated in
common form in this Court, but upon caveat being filed and
issues framed, it was determined by a jury sitting in the
Circuit Court for Baltimore County, that the said will was
invalid because the said Joseph Friedenwald was at the time
of its execution not of sound and disposing mind, and did not
understand the contents thereof.    Although these respondents
are legally bound by the verdict of the jury and the judgment

of this Court, thereupon, they still believed then and believe
now, notwithstanding said verdict that the said Joseph Fried-
enwald was of sound and disposing mind at the time he
executed the will of December 12th, 1910, and understood
the contents thereof, that he was just as competent to make a
will on December 12th, 1910, as he was on April 24th, 1903,
and that, *therefore,* these respondents do not believe that
the will of 1903 expresses the real and final intentions of
their father and grandfather with respect to his property, and
they are not interested in defending it; but inasmuch as all
the charitable and small pecuniary legacies will be paid by
the family of the said Joseph Friedenwald, even though the
will of 1903 is set aside, the only persons who might be
interested in sustaining the will of 1903 are the grand-
children of the late Joseph Friedenwald, and their descend-
ants, born and unborn, who have contingent interests under
said will, and these interests should be represented by some
person appointed by the Court to defend the will, at the cost
of the estate, to the extent that such person, in the exercise
of his independent judgment, in view of all the circum-
stances of the case, shall deem proper." On the same day
Mr. Edward H. Burke of the Towson Bar was appointed
special administrator *pendente lite,* "charged, however, with
the sole duty of defending said alleged will to the extent that
he in his independent judgment shall deem proper and to
secure its admission to probate if that is attainable on full
and fair investigation." He filed an answer on February
26, 1913. An effort was made to induce him to try the case
before the Orphans' Court, which, for reasons sufficient to
himself, he declined to do, and issues were sent on May 22,
1913, to the Circuit Court for Baltimore County for trial.

In the meantime the children of Albert A. Brager had
filed a petition in the Orphans' Court to be made parties,—
caveatees. This was resisted by all the parties and the peti-
tion was dismissed. The power of attorney to Rice was
revoked on February 14, 1913. Mr. and Mrs. Brager had

employed Mr. Randolph Barton, Jr., to take charge of Mrs. Brager's interest. The shadow of Brager had been projected across what appeared to be the easy and simple plan of an equal division of the estate, and the parties concluded that their interests required that Mrs. Brager be again dealt with in such a way as to finally eliminate her from the case. What was done was this: '

(*a*) An agreement dated March 4, 1913, was executed between Mr. and Mrs. Brager and the twelve heirs.

(*b*) A deed from Mr. and Mrs. Brager dated March 4, 1913, to the twelve heirs. This agreement provided:

1. That in the event of the will of Joseph Friedenwald bearing date April 24th, 1903, being finally set aside in the pending caveat proceedings, there shall be paid to Mrs. Blema Brager the sum of forty-four thousand five hundred dollars ($44,500) in full settlement of all claims of the said Blema Brager, Albert A. Brager, her husband, their children and their heirs, representatives and assigns.

2. As soon as this agreement is signed by the parties hereinbefore mentioned, there shall be placed in the hands of Edgar H. Gans, acting for all the parties hereto:

(*a*) A deed, duly executed by said parties of the first part conveying all their interest of every kind in the estate of Joseph Friedenwald, to the parties of the second and third parts, in such form as the said Edgar H. Gans shall approve.

3. This deed is to be held by said Edgar H. Gans in escrow until the final determination of the caveat proceedings. If said will is finally set aside, then the aforesaid payment of forty-four thousand five hundred dollars ($44,500) shall be made to the said Blema Brager by the administrators or the executors of the estate of Joseph Friedenwald, who are hereby authorized by the parties of the second and third parts hereto to deduct said sum for which they are respectively liable, from their respective shares of the estate of Joseph Friedenwald, in proportions of one-twelfth of said sum as to each

of the parties of the second part, and one-thirty-sixth of said sum as to each of the parties of the third part, and upon said payment being so made to the said Blema Brager, said deed is to be delivered by the said Edgar H. Gans to the parties of the second and third parts, and duly recorded.

4. If the final determination of the caveat proceedings does not take place until after the expiration of six months after the date of said deed, then the parties of the first part will execute a new deed, and any other conveyance which, in the judgment of said Edgar H. Gans, or his successor, as holder in escrow, may be necessary to convey a good title to the interests of said parties of the first part in said estate.

The deed recited that:

"WHEREAS, Joseph Friedenwald, father of said Blema Brager died on or about the 24th day of December, 1910, and payment has been made to said Blema Brager for all her interest in the property whether as heir at law, distributee, legatee or devisee, to which said Joseph Friedenwald was at the time of his death seized, possessed or in any way entitled,

"*Now, Therefore, this deed Witnesseth,* That in consideration of the premises and the sum of five dollars ($5), and other good and valuable consideration, the receipt whereof by the parties of the first part from the parties of the second and third parts is hereby acknowledged, the said Blema Brager and Albert A. Brager do hereby grant, assign and convey all the right, title and interest and estate of them, and either of them, in and to all the property and estate, real, personal and mixed, of which said Joseph Friedenwald was at the time of his death seized or possessed, or to which he was in any way entitled, including all right, title, interest and estate which the said Blema Brager may have as legatee or devisee under any will of said Joseph Friedenwald, and as heir at law or distributee of the said Joseph Friedenwald, unto and to the parties hereto of the second and third parts, and their respective heirs, personal representatives and assigns, in fee simple as to

real estate, and absolutely as to personal estate or property in undivided shares as follows:

"1. To Moses S. Friedenwald, Jacob H. Friedenwald, Leo W. Friedenwald, Florence Selz, Hiram W. Friedenwald, Benjamin B. Friedenwald, Jennie Hecht, Merla Thalheimer, Bertha Goldenberg, Aimee Beekman and Berleen Dessauer, each one undivided one-twelfth part thereof.

"2. To Herbert Bloch, Merla Bloch Wolf and Helen Bloch Shields, each one undivided one-thirty-sixth part thereof, making in the aggregate the remaining undivided one-twelfth part thereof."

The way then was unobstructed. All things had been arranged to the entire satisfaction of all the parties, and the trial began on June 30, 1913, and upon the uncontradicted evidence of three of the four caveators as to undue influence exercised upon the father by two of the caveatees the will was stricken down. The thing was easy. Mr. Barton felt that he had been "done," and Mr. Brager felt that his wife had been most unjustly treated; that she was justly entitled to three hundred thousand dollars, but under the settlements mentioned her brothers and sisters and the children of Mrs. Bloch would take a very large share of the estate to which she was in all fairness and good conscience entitled. Mr. Barton endeavored to induce them to take this view, but failing in this he accepted the money on August 6, 1913.

After full consideration the counsel for Mrs. Brager reached the conclusion that she was entitled to recover the balance due her as one of the heirs of her father. She accordingly brought this suit. It is an action of deceit, and the principles of law which govern that action have been announced in many cases in this Court, among which are *MacAleer* v. *Horsey,* 35 Md. 439; *Buschman & Cook* v. *Codd,* 52 Md. 202; *Robertson* v. *Parks,* 76 Md. 118; *Bouldin* v. *Stillwell,* 100 Md. 543; *Cahill* v. *Applegarth,* 98 Md. 493, and other cases.

The law as announced in these cases is accepted by us all. But the difference among us is over the legal effect of the evidence.

The declaration, after referring to the first settlement alleges that

"the other heirs of Joseph Friedenwald, including the aforesaid defendants, designing and intending to induce said Blema Brager to relinquish all claims which she might have growing out of the fraud perpetrated upon her whereby the assignment of her interest in said estate had been procured as aforesaid, and designing and intending to secure from said Blema Brager a further release and assignment of all her interest in said estate, did enter into further negotiations with said Blema·Brager, and did falsely and fraudulently represent to said Blema Brager that there was much uncertainty and doubt in their minds as to whether any sufficient evidence could be produced at the trial of said caveat to said will of 1903 to cause the setting aside of said will. and did falsely and fraudulently represent to said plaintiff that the only evidence which would be relied upon to support said caveat would be some evidence as to the lack of testamentary capacity on the part of said Joseph Friedenwald, and did falsely and fraudulently conceal from said Blema Brager the knowledge which they had as aforesaid regarding the circumstances under which said will had been executed; whereas in truth and in fact the other heirs of Joseph Friedenwald, including the aforesaid defendants, as already hereinbefore stated, well knew that said alleged will of 1903 was utterly void and had been obtained by undue influence practiced upon said Joseph Friedenwald by some of said other heirs of said Joseph Friedenwald, including the aforesaid defendants, and that if the true facts then known to the other heirs of said Joseph Friedenwald, including the aforesaid defendants, should be offered in evidence the invalidity of said alleged will of 1903 would indisputably appear; but the plaintiff, believing and relying mainly and sub-

stantially upon said representations of the other heirs of Joseph Friedenwald, including the aforesaid defendants, and being herself ignorant of the true facts, did agree that if said other heirs of Joseph Friedenwald, including the aforesaid defendants, would endeavor to set aside, and should succeed in setting aside the said 1903 will, she would sell, and she did accordingly sell and assign all her interest in said estate of said Joseph Friedenwald, for the sum of forty thousand dollars ($40,000), in addition to the amount previously received by her for the same, to the said other heirs of Joseph Friedenwald, including the aforesaid defendants."

As the prayer granted by the Court withdrawing the case from the jury made no reference to the pleading, we are not concerned with any question of variance between the allegations of the declaration and the evidence. The evidence alone is to be considered, and, in our opinion the decision must rest upon the determination of the question as to whether there was any legally sufficient evidence offered to support the allegations, quoted above, as to the second settlement.

Upon the facts stated above we have no doubt that Mrs. Brager was not absolutely bound either in law or in equity by the first settlement; that it was a voidable instrument, and that she had a right, irrespective of any question of fraud, to have rescinded or repudiated it. *Wood* v. *Patterson,* 4 Md. Ch. 335; *Wilson* v. *Md. Ins. Co.,* 60 Md. 150.

One of the objects of the second settlement apparently was to deprive her of that right, and if that settlement is to be held binding upon her, her right of rescission is gone. Was it to extinguish this right, which in this case was a valuable one, that the subsequent settlement was made? Why was she approached by Rice, and induced by representations contained in the power of attorney,—which the jury upon the evidence might have found to be untrue,—to execute an instrument giving him power to do anything with respect

to her estate which in his unlimited discretion he saw fit to do? If she had parted with all her rights, why was the second settlement made? Why pay her forty-four thousand five hundred dollars? Was it because of a fear that the disclosures of the trial of the 1903 will would lead Mrs. Brager to repudiate the first settlement? If Mrs. Brager had been settled with and had no further rights, why all these elaborate and skilfully drawn instruments designed to render her helpless to protect herself? What was the real plan and mission of Jacob A. Rice? These were all questions for the jury to answer.

We now turn to the circumstances under which the second settlement was made. This was negotiated between Mr. Harley, representing at least four of the parties, and Mr. Barton, representing Mr. and Mrs. Brager. The terms of the settlement were approved by all parties. There is no evidence in this record to show, or tending to show that Mr. Gans made any representations of any kind to anyone to induce this settlement. He was not interested in maintaining the will, and he appears simply to have stood aside and let the caveators strike down the will upon any evidence in their possession.

It is reasonable to suppose that the counsel must have known that the evidence of these three witnesses was sufficient to set the will aside. Did Mr. Harley know of this evidence? Dealing with the record as we find it, the jury might have reasonably concluded that he did know it, and that he was relying upon it to avoid the will. If he did know the facts, there can be no doubt that the evidence tends to show that he suppressed them in his negotiations with Mr. Barton, and that he made affirmative representations which misled Mr. Barton. If, however, Mr. Harley did not know the facts referred to at the time of his negotiations with Mr. Barton, the parties who with knowledge of those facts secured the settlement with Mrs. Brager upon the basis of affirmative representations which misled her counsel and induced the settlement, would be liable in this action, notwithstanding

their attorneys' ignorance of the facts. We do not mean to
decide that Mr. Harley did in fact suppress these facts or
that he did in fact mislead Mr. Barton. What we do say is
that this record, in the absence of explanation of counter-
vailing proof, tends to show these facts. Mr. Barton, testify-
ing as to the representations made by Mr. Harley during the
negotiations, said: "Q. Your claim is, as I understand it,
that you were lead to believe that the 1903 will would very
probably be sustained? A. That it could very probably be
sustained. Q. Is that your complaint? A. That is the
impression that was made on me. Q. As a matter of fact,
it turned out the will was broken? A. I do not complain it
turned out the will was broken, that was the thing I was most
anxious to accomplish. Q. That is what I want to under-
stand? A. But I was given to understand or rather led to
understand, it would be a very difficult thing to do, and if
broken at all it would be broken on the ground of testament-
ary incapacity. Q. That is what you were given to under-
stand? A. Yes. Q. Assuming that you were misled about
that, will you kindly explain to us how your client could
have been hurt by it in view of the fact if the will were a
good will and were sustained she was by the will excluded
and if it was not a good will she was by this agreement
excluded? *Q*. Do you want an answer to that? *A*. I do.
If we had known these facts—— Q. What facts? A. The
facts which developed at the trial of the 1903 will case, we
would have been independent of anybody; we would have
gone in and caveated the will, I would not allow Mr. Brager
on my advice to settle at any such figure had I known that
such evidence was in existence. Q. How could you have
caveated the will if Mrs. Brager had sold out her interest?
A. I would have repudiated that. Q. How would you have
repudiated it? A. On the ground of radical mistake if noth-
ing else. Q. On the ground of radical mistake? A. Yes, sir.
Q. Did you ever repudiate it? A. I did not have occasion
to; a settlement was reached; we virtually repudiated it by
making a new claim."

We have in the record legally sufficient evidence tending to prove the following facts:

*First*—A settlement which resulted in injury to the plaintiff;

*Second*—A settlement procured by statements upon which the plaintiff relied and which misled her to her injury;

*Third*—A settlement procured by withholding from her material facts resting within the exclusive personal knowledge of some of the defendants who were hostile to her and of which she was ignorant and which she had no means of ascertaining. With evidence tending to prove these facts the question is: Was the suppression of these material facts in connection with the representations as to the ground upon which the will was to be attacked sufficient to sustain the action?

Assuming that Mr. Harley was under no legal obligation to disclose the real facts to Mr. Barton, it by no means follows, under the circumstances of this case, that the plaintiff's case must fail. Where one is under no legal obligation to speak, his mere silence or his mere non-disclosure of material facts will not be sufficient, but if in addition to non-disclosure he makes "some active mis-statements of fact, or, at all events, such a partial and fragmentary statement of fact," as entirely misleads one to his injury the legal situation is entirely changed: *Peek* v. *Gurney,* L. R. 6 H. L. 377; *Arkwright* v. *Newbold,* 17 Ch. Div. 301.

In *Laidlaw* v. *Organ,* 2 Wheaten, 195, the question was whether the knowledge of the signing of the treaty of Ghent, which materially affected the price of the goods bargained for, and which was exclusively within the knowledge of the vendee, ought to have been communicated to the vendor, CHIEF JUSTICE MARSHALL, in reversing the judgment, said: "The Court is of opinion that he was not bound to communicate," and further added: "It would be difficult to circumscribe the contrary doctrine within proper limits *where the means* of intelligence are equally accessible to both parties. But, at the same time, each party must take care not to say

or do anything tending to impose upon the other. The Court thinks the absolute instruction of the judge was erroneous, and that the question *whether any imposition was practiced by the vendee upon the vendor ought to have been submitted to the jury.*"

In *Gale* v. *McCullough,* 118 Md. 287, the Court adopted and applied the rule stated in *Kerr on Fraud and Mistake* that "the existing intention of a party at the time of contracting is a matter of *fact,* and may be material to the **validity of a contract;** so that if it be proved that when a person has fraudulently misrepresented his *intention* in some material point for the purpose of inducing it, it may be sufficient ground for avoiding the contract."

In *Coan* v. *Consolidated Gas Electric Light and Power Company,* 126 Md. 506, the question was as to the effect of false and deceptive representations of an agent of the appellee as to his intentions in buying the land. The question arose upon a demurrer to the bill. JUDGE URNER, in delivering the opinion of the Court referred to *Gale* v. *McCullough, supra,* and said: "In *Adams* v. *Gillig,* 199 N. Y. 314, a lot was sold and conveyed in reliance upon the vendee's assurance that he intended to erect a dwelling house upon it, whereas his secret purpose, which he at once proceeded to carry into effect, was to use the ground for the erection of a garage; and in *Brett* v. *Cooney,* 75 Conn. 338, a sale of improved property was induced by the representation of the purchaser that he desired it for use as a home, while in fact he was securing it for boarding house purposes. By the decision in each of these cases the conveyance under inquiry was held to have been procured by fraud and was accordingly vacated. In *Thompson* v. *Barry,* 184 Mass. 429, and *Williams* v. *Kerr,* 152 Pa. St. 560, similar conclusions were reached upon somewhat analagous facts.

"The representations here alleged to have been made were undoubtedly material to the transaction, and as they are conceded by the demurrer to have been false and deceptive and

to have induced the plaintiff to make the conveyance with resulting injury to her interests, a sufficient case is shown for equitable rescission on the ground of *fraud* and *deceit.*"

Assuming, as we must do, for the purpose of his case, the truth of the evidence in the record, we are bound to submit to the consideration of the jury the intention or purpose of Mr. Harley in making the representations, which Mr. Barton testified he did make to him.

The other questions present no difficulty. So far as Mrs. Brager was concerned the contract was executed. Two courses were open to her under the law of this State: *First,* to repudiate the settlement; and, secondly, with full knowledge of the facts to ratify it and recover in an action at law the damages she has suffered. She has chosen the latter course. *Groff* v. *Hansel,* 33 Md. 166; *Byrd* v. *Rautman,* 85 Md. 416; *Weaver* v. *Shriver,* 79 Md. 530.

In the last cited case, which was an action of deceit, the Court said: "If, after the discovery of the alleged fraud, the plaintiff treated the contract as still in force, and we think there is sufficient proof in the record to have justified the jury in finding that he did so, such ratification could only have the effect of preventing a subsequent rescission. This Court in *Groff* v. *Hansel,* 33 Md. 166, has said that: 'In all cases of fraud the vendee, who alone has the right of disaffirmance, may remain silent, and bring his action to recover damages for the fraud, or may rely on it, by way of defense, to the action of the vendor, although there has been a full acceptance by him, with knowledge of the defects of the property. An affirmance of the contract by the vendee, with such knowledge, merely extinguishes his right to rescind the sale. His other remedies remain unimpaired.' The plaintiff had the undoubted right to bring his action in the form he has selected, and it was equally his right to waive his action for deceit, and avail of the alleged false representations as matter of defense in reduction of damages, or in bar of a recovery in the suit upon the promissory notes now pending. This we take to be well established law."

We have examined the exceptions to the rulings on evidence, and, without further prolonging this opinion by a discussion of them, we will merely say that we find no error in any of the rulings.

In concluding this opinion we might say that we have found no case in this Court or elsewhere, wherein the facts are analagous to those disclosed by this record. But if the plaintiff's contention is true her brothers and sisters are in a possession of a large sum of money to which she is entitled and which in law and in all good conscience they should restore.

For the reasons stated in this opinion the judgment was reversed, with costs and a new trial awarded in the *per curiam* order dated February 10th, 1916.

> *Judgment reversed, with costs, and new trial awarded.*

---

MEMORANDUM, appended by JUDGE BURKE to his original opinion.

Without changing or modifying the principles announced in the above opinion, or impairing the force of the conclusion, we deem it proper, in order to avoid any possible misapprehension or misunderstanding of certain expressions occurring in the opinion to add this explanatory note. We were dealing with a purely legal question, and in its consideration we were required to assume the truth of all the *facts* contained in the record, and we are not to be understood by anything said in the opinion as expressing our views as to the truth, or falsity, or credibility of any of the testimony. We had no authority to do that. We did not intend to say anything that would reflect upon the personal or professional honor or integrity of Mr. Harley, and we do not think we did so. Assuming the truth of all the facts in the record, and according to the plaintiff the benefit of all legitimate inferences

or deductions from them in support of her case, we held that the case should have gone to the jury for them to say upon all the facts and circumstances in evidence whether the plaintiff should recover. It may be added that Mr. Barton in his testimony repudiated the suggestion that Mr. Harley had intentionally or knowingly misled him, and expressed the view that Mr. Harley himself may have been misled by his clients. It may be that his clients did suppress, or withhold the facts, and in this way did mislead him. If that be the fact it may be shown upon the re-trial of the case, and if shown, a situation would be presented which is fully covered in the opinion.

Filed April 26th, 1916.

---

STOCKBRIDGE, J., delivered the following dissenting opinion, in which BOYD, C. J., concurred:

A careful study of the record in this case leads me to a different conclusion from that of the majority of the Court. There will be no attempt to review all the details of the case, but only to point out certain matters which do not appear to me to have been given their proper weight.

The action is one for deceit and the defendants in this case are six of the children of the late Joseph Friedenwald, viz., Jacob H., Benjamin B. and Hiram Friedenwald, Mrs. Hecht, Mrs. Thalheimer and Mrs. Goldenberg. Some of the others have been sued in Baltimore County, and some are beyond the reach of the process of the Courts of this State.

Two distinct matters of deceit are charged in the declaration, one an alleged concealment of the amount of the estate of Joseph Friedenwald, and of the sum which each of his children would be entitled to in the event of his intestacy as the consequence of setting aside his will. The other consisted of a misrepresentation of the grounds upon which the attack was to be made upon his will executed in 1903. As

the second of these grounds only is dealt with in the opinion of the majority of the Court, nothing is now said in regard to the first grounds except that I do not find any such concealment or misrepresentation as would sustain this action.

In considering the second ground it is well to have in mind what is necessary to maintain an action of this character. The requisites have been repeated in a large number of cases in Maryland, but nowhere with greater clearness and precision than in *Boulden* v. *Stilwell,* 100 Md. 543, where Judge Pearce, speaking for this Court, said: "The foundation of the action is actual fraud, and nothing short of this will suffice. Consequently a misrepresentation believed by the speaker to be true, though induced by his ignorance or negligence, will not sustain an action for deceit. There must be either knowledge of the falsity of the representation or such reckless indifference to truth in making it, as is held equivalent to actual knowledge. The fraud must be material, by which is meant that without it the transaction would not have been made. It must be the statement of an alleged existing fact or facts and not merely of some future or contingent event, or an expression of opinion as to the subject of the statement. The party to whom it is made must rely upon its truth, and must have the right, as a person of ordinary business prudence, to rely upon it, otherwise it is his own folly or fault for the consequence of which he can not ask relief of the law. Finally, there must be damage directly resulting from the fraud."

Applying the standard thus given to the facts of this case, of what do the misrepresentations consist? Are they to be found in a conspiracy upon the part of twelve of Mr. Friedenwald's children to defraud their sister, Mrs. Brager, out of her interest in her father's estate? There is no direct evidence of such conspiracy. Is it a necessary inference from the facts which are testified to? Mr. Friedenwald had urged his children to live in harmony with one another. Within a few days after his death, Mr. Brager acting for his wife, had indicated his purpose to seek to set aside the

will of 1910, and then by his counsel had followed up the attorney for the estate, seeking to be bought off from making a contest, and was paid by eight of the children $45,000 to avoid his threatened litigation. After the will of 1910 had been set aside as the result of proceedings instituted by others aided and urged on by Mr. Brager, he again appears by other counsel eager to be again bought off from attacking the will of 1903, and again he is successful in being paid a price for peace. Is not the inference as reasonable that the twelve children of Mr. Friedenwald paid the price of $44,500 in addition to the earlier payment of $45,000, in order to carry out the solemn injunction of their father, as that of a conspiracy to defraud Mrs. Brager? If so, the plaintiff has not met the burden of proof required in an action of deceit.

As there must be an actual misrepresentation to sustain a suit of this nature, it follows that is must be made by some person or persons. Who was it in this case? All of the twelve or only some of them, and if so, which? Mr. Brager in his testimony fails to state. The negotiations preceding both settlements made were not between th parties directly, but through their counsel. Mr. Barton was representing Mrs. Brager. His negotiations appear to have been almost entirely with Mr. Harley. Did Mr. Harley practice a deception on Mr. Barton as to the grounds upon which reliance was to be placed in the caveat to set aside the will of 1903? That is best answered by Mr. Barton himself in his testimony: "During our conversation the exact ground of attack was never gone into very particularly with me, it was not a matter of any very particular interest to me at that time, but it was stated, I can not remember the exact time, it was an attack to be made upon the ground of testamentary incapacity, by Mr. Harley. I may say the subject was not gone into in detail." * * * Q. Do you think anybody was guilty of fraud? A. I do not. * * * We have made no such charge. Q. Whom do you charge with being guilty of acting deceitfully; what persons do you refer to? A. I don't charge anybody. Q. Do you charge Mr. Gans in acting towards you deceitfully

with intent to defraud you? A. No, I do not charge him
with it. Q. Do you charge Mr. Harley with not having fully
disclosed the facts to you? A. I have stated the facts; what
the explanation may be I don't know. * * * My knowledge
of such men as Mr. Harley and Mr. Gans and Mr. Frank is
such that I haven't the slightest idea they would be guilty
of any suppression of facts, or anybody. * * * Q. Whom do
you charge with fraud? A. The six defendants. Q. You
never saw any of them? A. Never. Q. You never talked
with any of them? A. I think the only time I ever came
in contact with any of the people personally was at Mr.
Gans' office when I think the papers were exchanged. * * *
Q. Do you charge Mr. Harley with having intentionally
made any false statements to you in connection with this
matter? A. No, sir; I certainly do not. I know so much
about Mr. Harley I do not believe he would; I believe he is
an honorable man as I try to be myself." It does not seem
to me that this testimony furnishes a sufficient ground upon
which to base a legitimate inference of a deception practiced
upon Mrs. Brager or her attorney to sustain the action of
deceit.

When the settlement was arranged prior to the trial of the
validity of the will of 1903, the sum agreed to be paid to
Mrs. Brager by the other twelve children was $44,500. But
the money was not paid at that time. It, as well as the con-
veyance of Mrs. Brager's interest in her father's estate, was
placed in escrow in the hands of Mr. Edgar H. Gans, and
the consummation of the agreement was dependent upon the
outcome of the trial of that will case. If it terminated one
way, the money was to be paid over to Mrs. Brager and the
deed delivered to the twelve other children of Mr. Frieden-
wald, or their representatives; while if the result terminated
the other way the deed was to be returned to the Bragers and
the money to the twelve children. The contract was thus an
executory contract at the time when the caveat to the will of
1903 was tried.

Even if it be assumed that there was a fraud perpetrated, or that sufficient facts have been shown from which, uncontradicted, there could be a legitimate inference of fraud, which does not appear to me to be the case, nevertheless Mrs. Brager should not be entitled to maintain this suit. If in addition to the above assumption, it is further assumed that prior to the trial of the case involving the validity of the 1903 will, Mrs. Brager was without knowledge of any undue influence practiced upon her father, as the result of which that will was executed in the form in which it was, and that Mrs. Brager was without knowledge that the line of attack was to be made on the theory of undue influence, she became fully cognizant of the fact when that case was tried, and therefore, knew then, even if she did not earlier, of the fraud now claimed to have been practiced upon her. In spite of all this, more than thirty days later, she, by her counsel, called upon Mr. Gans for the payment of the $44,500, and so far as the testimony discloses made no attempt, either for the rescission of the contract or its repudiation. On this demand being made in August upon Mr. Gans, he paid over the money which had theretofore been held in escrow, and there was thus released for delivery to the other twelve the deed from Mrs. Brager. The effect of this demand, at the time when made, under the well settled rule of law, operated to condone the fraud, and waive any right of action which Mrs. Brager had up to that time. This rule is stated in 20 *Cyc.* 92, as follows: "Although an action of deceit based upon fraud in the procurement of a contract proceeds upon the theory of affirmance of the contract by the defrauded party an important distinction exists with respect to acts done in affirmance of the contract after discovery of the fraud. If the defrauded party acquires knowledge of the fraud while the contract remains executory and thereafter does any acts in performance or affirmance of the contract or exacts performance from the other party, he thereby condones the fraud and waives his right of action. Under such circumstances a recovery would be largely if not entirely for

self inflicted injuries and the maxim *volenti non fit injuria,* applies."

The reasons for this rule are stated with great elaborateness in *Kingman* v. *Stoddart,* 85 Fed. Rep. 740.

In the case of *Simon* v. *Goodyear Co.,* 105 Fed. 573, Mr. Justice Lurton concisely recites the doctrine in these terms: "If one after full knowledge of the fraud and deceit by which he has been induced to make a sale of property goes forward and executes it notwithstanding such fraud the damage which he thereby sustains is voluntarily incurred. The maxim *volenti non fit injuria* has application to all loss resulting from the voluntary execution of a non-obligatory contract with full knowledge of the facts which render it voidable. Fraud without damage is not actionable. If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not as he chooses. If he executed it the loss happens from such voluntary execution and he can not recover for a loss which he deliberately elected to incur."

And to the same effect are the cases of *People* v. *Stephens,* 71 N. Y. 527; *Fitzpatrick* v. *Flannagan,* 106 U. S. 648; *McDonough* v. *Williams,* 77 Ark. 261; *Tuttle* v. *Stovall,* 134 Ga. 331; *Gilmer* v. *Ware,* 19 Ala. 252; *Hein* v. *Westinghouse Co.,* 172 Fed. 526; *Richardson* v. *Lowe,* 149 Fed. 632: *Brown* v. *Brown,* 142 Ill. 409; and *St. John* v. *Hendrickson,* 81 Ind. 350. See also, 1 *Page on Contracts,* sec. 139; *Schmidt* v. *Mesmer,* 116 Cal. 267.

In view of the testimony in this case and what appears to be a well established rule of law, I feel compelled to dissent from the view entertained by the majority of this Court.

Filed March 2, 1916.