686 A.2d 647

**VF CORPORATION, et al.**

v.

**WREXHAM AVIATION CORPORATION.**

**No. 1700, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 27, 1996.

Reconsideration Denied Jan. 9, 1997.

**704**

**706**

Benjamin R. Civiletti (Nell B. Strachan, Mitchell Y. Mirviss and Venable, Baetjer and Howard, LLP, on the brief), Baltimore, for Appellants.

Melvin J. Sykes, Baltimore (David P. Sutton, Baltimore, Timothy E. Meredith and Warfield, Meredith & Darrah, Severna Park, on the brief), for appellee.

Argued before MURPHY, C.J., HARRELL, J., and JAMES S. GETTY, Judge (Retired), Specially Assigned.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore City, a jury assessed compensatory and punitive damages against VF Corporation

("VF") and one of its subsidiary corporations,[1] appellants, for concealing from Wrexham Aviation Corporation, appellee, certain tax information about an aviation freight company that appellee purchased from appellants. The Honorable Edward J. Angeletti, who presided over the trial, conducted a post-verdict review and

**ORDERED,** that judgment be entered in favor of Wrexham Aviation Corporation, Plaintiff, against:

(a) VF Corporation and Wrangler Apparel Corporation, jointly and severally, for:

(1) compensatory damages of $189,336.61 plus pre-judgment interest at the rate of 6% per annum from October 23, 1990; and

(2) punitive damages of $21,416,430.00 plus post-judgment interest at the statutory rate of 10% per annum from June 21, 1995; and

(b) Wrangler Apparel Corporation for compensatory damages of $535,000.00 plus pre-judgment interest from October 23, 1990.

In this appeal from those judgments, appellants present us with the following questions:

I.   In an action for fraudulent concealment based on non-disclosure of a field tax audit completed the day before the closing,

a.   can [appellee] recover without proving that [appellants] knew of a duty to disclose?

b.   does reliance on advice by counsel—who advised that [appellants] had no duty to disclose—defeat fraud?

II.   Where [appellants'] only duty to [appellee] springs from a contract, is [appellee] barred from bringing a duplicative tort action?

---

**1.**   Blue Bell, Inc. was the VF subsidiary involved in the sale, but the judgments for which it had been held responsible were entered against Wrangler Apparel Corporation, its successor in interest.

III.   In a case claiming a breach of warranty and fraud for the same act, can [appellee] recover more than the fraud damages of $189,336 [.61], the taxes actually paid?

IV.   Can punitive damage of $21.4 million, or more than 100 times the tort damages, be affirmed where

   a.   no reprehensible, egregious or malicious conduct is present?

   b.   [appellants] relied on the advice of counsel?

   c.   the wealth of [appellants] was the principal basis in the [c]ourt's instructions and post-trial opinion to obtain and justify the $21.4 million award?

To question I.a., we answer that, while knowledge of a duty to disclose was an essential element of the action asserted in this case, the issue of whether appellants had such knowledge was properly submitted to the jury.  To questions I.b. and IV.b., we answer that, while there are indeed circumstances in which reliance on advice by counsel will be a complete defense to a fraud claim, the issue of whether appellants were entitled to prevail on this defense was properly submitted to the jury. We answer question II in the negative and question III in the affirmative.  We shall therefore affirm each compensatory damage judgment.

To question IV.a., we answer that, while malicious conduct is an essential element of a punitive damage action, the issue of whether appellants were guilty of such conduct was properly submitted to the jury.  To question IV.c., we answer that, while a defendant's wealth cannot be the principal basis for a punitive damage award, we reject the contention that the trial court erred in its instructions.  We must, however, vacate the punitive damage judgment in light of *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).  The parties are entitled to a post-verdict review of the punitive award by the circuit court, who shall apply the *BMW* standards to the facts of this case.

## Background

Wrangler Aviation Corporation ("Wrangler"), originally an air freight division of a VF subsidiary, was "spun off" and sold in 1988. VF financed part of this sale and took back a secondary security interest. In May of 1990, VF was advised that Wrangler was in breach of its primary loan agreement, and that the loan would be called unless VF stepped in to cure the default. VF did so and then assumed direct operating and managerial control of Wrangler.

Until it was sold to appellee, Wrangler was operated as a wholly-owned subsidiary of VF, with a VF employee, Varnell Moore, serving as President and CEO of Wrangler. It continued to be a financially vulnerable company that was kept in operation with cash infusions from appellants. VF decided to offer Wrangler for sale. Appellee decided to purchase it.

Frank Pickard, VF''s treasurer, handled the sale for appellants. The parties reached an agreement of sale on October 19, 1990.[2] On that date, appellee executed a Purchase Agreement that contained the following provisions:

9.(h) Attached hereto as Schedule 9(h) is a copy of the Company's financial statements for the fiscal year ended June 30, 1990, which were audited by KPMG/Peat Marwick. To the best of Seller's knowledge, such financial statements, including any qualifications set forth therein, fairly present the Company's financial condition and results of operation for the Company's fiscal year ended June 30, 1990....

. . . .

As used in this Section 9, the term "knowledge" shall mean the actual knowledge of any of the officers of the Seller and VF....

. . . .

---

**2.** The agreement provided that for its payment of 2.6 million dollars and assumption of 1.7 million dollars of Wrangler's debts, appellee would receive 100% of Wrangler's stock, then held by a VF subsidiary known as Blue Bell, Inc., and that VF would "forgive" loans that it had made to Wrangler.

*13.(a) There shall not be any material error, misstatement or omission in the representations and warranties made by the Seller in this Agreement; all representations and warranties by the Seller contained in this Agreement shall be true in all material respects at and as of the Closing as though such representations and warranties were made at and as of said date; . . . .*

. . . .

16. . . . In connection with the Buyer's due diligence examination of the Business of the Company, the Buyer has not relied upon any statement, opinion, representation, or warranty of the Seller VF, or either of their respective directors, officers, employees, agents, or representatives, express or implied, other than those representations and warranties of the Seller expressly set forth in Section 9 hereof or elsewhere in this Agreement. . . .

(Emphasis supplied.)

Closing was scheduled to take place in Baltimore on October 22 and 23, 1990. Section 7(a)(v) of the Agreement provided that, at closing, the seller would deliver a Closing Certificate containing the following provision:

The Seller hereby certifies that all of the representations and warranties with respect to the Seller contained in the Purchase Agreement are true, accurate and complete in all material respects on and as of the date hereof. The delivery of this Certificate in no way expands, diminishes or supersedes the warranties and representations of the Seller contained in the Purchase Agreement.

### *The Events of October 22, 1990*

On October 22, 1990, Larry Harden, Wrangler's comptroller, was presented with a "field audit report" in which the North Carolina Department of Revenue asserted that Wran-

gler owed $372,199.45 in sales and use taxes.[3] The North Carolina authorities also asserted that (1) Wrangler had been incorrect in its position that, because jet fuel was a "lubricant," it was entitled to certain sales and use tax refunds under North Carolina law; (2) the Department of Revenue had determined that these taxes were not refundable; and (3) the refund claims, approximately $107,000 in fiscal year 1990, would no longer be available to Wrangler. This information was communicated to Mr. Pickard.

### The Events of October 23, 1990

At the October 23, 1990 closing, despite the fact that he knew about the events of the previous day, Mr. Pickard did not tell any of appellee's representatives about the field audit report. Instead, he signed and delivered the Closing Certificate, reasserting the truth of all representations made in the Purchase Agreement. The Closing Certificate included the following representation:

> [t]o the best of Seller's knowledge, such financial statements, including any qualifications set forth in the accountant's opinion and the accompanying footnotes set forth therein, *fairly present the Company's financial condition* and results of operation for the fiscal year ended June 30, 1990.

(Emphasis added.)

### The Trial

The jury heard testimony that appellee suffered damages of $831,366.61 because (1) the fact that jet fuel refund claims would no longer be available to Wrangler reduced its actual value by $642,000.00; and (2) appellee subsequently paid $189,336.61 to resolve the tax audit. The jury also heard testimony that on October 22, 1990, word of the North Carolina tax audit report was relayed up the chain of command to

---

3. During his discussion with the auditor, Mr. Harden discovered two errors in the report. Adjustment for those errors reduced the amount owed by about forty thousand dollars.

Wrangler's CEO, Mr. Moore, who was very concerned that the field audit would delay the closing or that it would be a "deal breaker."

Moore discussed the problem with Mr. Pickard, who in turn conferred with Ernest Choquette, the attorney handling the closing for VF. Mr. Choquette testified that because the audit was in the preliminary stages, and because the amount of money involved was "not significant," he advised Pickard that VF had no duty to disclose the field auditor's report.

Appellants argued to the jury that (1) they did not commit a breach of warranty because, in the context of this sales transaction, nondisclosure of the proposed tax assessment was not a "material" omission, and (2) even if the audit should have been disclosed, they had not committed a fraud because their decision to remain silent was made in good faith reliance on advice of counsel. At the conclusion of a well tried case, the jury awarded to appellee the damages ultimately reduced to judgment by Judge Angeletti, who stated in his post-verdict *Memorandum Opinion* that appellants had committed an "egregious, outrageous act of white-collar villainy."

## Discussion

### I

Appellants argue that we must reverse the fraud judgment because appellee failed to generate a jury issue on the element of scienter. That argument overlooks the fact that the jury was entitled to infer scienter from the totality of the circumstances.

When a party owes no legal obligation to speak, mere silence is not actionable fraud. If, however, "what is stated amounts to a 'partial and fragmentary' disclosure, that misleads because of its incompleteness, the 'legal situation is entirely changed.'" *Lubore v. RPM Associates, Inc.,* 109 Md.App. 312, 330–31, 674 A.2d 547 (1996) (quoting *Brager v. Friedenwald,* 128 Md. 8, 31–32, 97 A. 515 (1916)). Moreover,

[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood. The concealment becomes a

fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.

*Schnader v. Brooks,* 150 Md. 52, 57–58, 132 A. 381 (1926); *See also Lubore,* 109 Md.App. at 330, 674 A.2d 547.

The elements for fraudulent misrepresentation are " '(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.' " *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 229, 652 A.2d 1117 (1995) (quoting *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882 (1986)).

To prevail on its fraud claim in this case, appellee was required to persuade the jury that (1) at closing, appellants owed to appellee a duty to disclose all material facts; (2) the field audit report was a material fact; (3) appellants concealed that fact from appellee; (4) because of their failure to disclose the existence of the field audit report, appellants' representations about the then existing financial condition of Wrangler were false in a material respect; (5) appellants' failure to disclose the material fact was intended to defraud or deceive appellee; (6) appellee completed the transaction while justifiably relying on appellants' false misrepresentations; and (7) appellee suffered damages from appellants' concealment. *Lubore,* 109 Md.App. at 329, 674 A.2d 547. *See also Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 346, 612 A.2d 322 (1992), *cert. granted* 329 Md. 168, 617 A.2d 1085, *dismissed before oral argument,* 330 Md. 318, 624 A.2d 490 (1993); *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232,

469 A.2d 867, *cert. denied* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). We are persuaded that appellee offered enough evidence on each of these elements to support the jury's findings.

Appellants define scienter in a fraud action as "the actual awareness that a wrong is being done." We do not disagree with that definition. The trier of fact, however, may infer such awareness from the concealment of material facts. *Lubore*, 109 Md.App. at 330, 674 A.2d 547 (citing *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 239, 469 A.2d 867 (1984)). The jury was entitled to conclude that, under the Purchase Agreement, appellants had a duty to disclose the field audit report because its existence was a material fact that qualified appellants' earlier representations as to the financial condition of Wrangler. The jury was also entitled to conclude that appellants were well aware that they should have spoken up about the tax audit, and that they remained silent because they were afraid that appellee would consider the audit to be a "deal breaker."

### A. Knowledge of the Duty to Disclose

Both the duty to disclose and the defendant's scienter must be proven in a fraud action. Scienter is the intent to deceive or defraud. *See Gross v. Sussex*, 332 Md. 247, 260, 630 A.2d 1156 (1993). According to appellants, the failure to disclose is negligent rather than fraudulent unless the nondisclosure is the product of an active and conscious decision taken with actual knowledge that disclosure was required. We do not disagree with that proposition. To hold otherwise would convert plainly negligent acts into fraud.

No fraud is committed by the defendant who ignorantly or negligently believes that the misrepresentation is true, *e.g. Gross*, 332 Md. at 260, 630 A.2d 1156; *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982); *Weisman v. Connors*, 76 Md.App. 488, 498, 547 A.2d 636 (1988), or by the defendant who merely exercises bad judgment. *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 239, 652 A.2d 1117

(1995). Appellants claim that these principles support their argument that appellee failed to prove fraud. Intent, however, may be inferred from the evidence, including appellants' conduct. *State v. Raines*, 326 Md. 582, 591, 606 A.2d 265 (1992); *Henderson v. Maryland Nat'l Bank*, 278 Md. 514, 520, 366 A.2d 1 (1976); *McClung–Logan v. Thomas*, 226 Md. 136, 148, 172 A.2d 494 (1961).

Appellants continue to insist that they did not know that they had a duty to disclose the tax audit report to appellee. They had every right to produce evidence in support of that contention. The jury, however, was entitled to reject that evidence and come to a contrary conclusion. The jurors were properly instructed that they were entitled to believe all, part, or none of the testimony presented and that they were permitted to draw reasonable inferences from the evidence.

■ Under the circumstances of this case it was not unreasonable for the jury to disbelieve appellants' evidence denying scienter, and to conclude that appellants decided that they would remain silent about the field audit out of fear that appellee would refuse to complete the transaction if the true facts were disclosed. The evidence was more than sufficient to support the jury's finding that, prior to closing on October 23, 1990, appellants were well aware of the fact that they should have told appellee about the tax audit report.

### B. Advice of Counsel

■ Appellants also contend that, because reliance on advice of counsel is a defense to a fraud action, they are entitled to a judgment in their favor on the fraud count. Reliance on the advice of an attorney does indeed bear on scienter; it follows from the rule that if a misrepresentation is honestly made, the person who made the misrepresentation has not committed a fraud. *See Brashears v. Collison*, 207 Md. 339, 349–51, 115 A.2d 289 (1955). To prevail on an advice of counsel defense, however, appellants were required to persuade the jury (1) that they communicated to counsel all facts they knew or reasonably should have known; and (2)

that they relied in good faith upon the advice given. Judge Angeletti gave the following instruction on this issue:

> If you find that [appellants] acted in good faith upon the advice of counsel, then you must find that [appellants] did not have the necessary intent to deceive.

> To find that [appellants] relied on the advice of counsel, one is not protected by the advice of counsel in a case such as this unless they have communicated to their counsel all the facts bearing upon the issue before you which either they knew or by reasonable diligence could have ascertained.... A good faith defense does not work unless they had all the facts.

That instruction was correct. Appellants' evidence entitled them to a jury determination of whether they did or did not act in good faith. Appellants were not, however, entitled to prevail on that issue as a matter of law.

## II & III

■ According to appellants, their failure to disclose the tax audit was a mere breach of warranty, and Judge Angeletti erred when he allowed a contract claim to be tried as a fraud action. We disagree. An act that constitutes breach of contract may also constitute fraud. *Cf. Gross v. Sussex*, 332 Md. 247, 258, 630 A.2d 1156 (1993); *Sonnenberg v. Security Management Corp.*, 325 Md. 117, 125, 599 A.2d 820 (1992).

Appellants also argue that appellee received a "double recovery" for the same damages. Certainly appellee "would not [be] permitted to recover twice for the same tort merely because the wrong gave rise to alternative theories of recovery." *Shapiro v. Chapman*, 70 Md.App. 307, 315, 520 A.2d 1330 (1987). In this case, however, it is certain that appellee recovered different types of damages.

■ The verdict sheet contained the following two questions about compensatory damages:

> 2. What amount of compensatory damages, if any, do you assess in favor of Wrexham Aviation Corporation as a result of the failure to disclose the audit?

    a)  Damages _____

    b)  Pre-judgment Interest  Yes ____  No ____

    . . . .

5.  What amount of compensatory damages, if any, do you assess in favor of Wrexham Aviation Corporation as a result of the breach of warranty?

    a)  Damages _____

    b)  Pre-judgment Interest  Yes ____  No ____

---

Hindsight indicates that there should have been only one "compensatory damages" question. Appellants, however, did not object to the verdict sheet at any time before it was submitted to the jury. Their present complaint comes too late. *Edwards v. Gramling Eng'g Corp.*, 322 Md. 535, 550, 588 A.2d 793 (1991).

■ On line 2.a., the jurors entered $189,336.61. On line 5.a., the jurors entered $535,000. The jurors answered yes to questions 2.b. and 5.b. Those answers reflect the damage award appellee's trial counsel requested in the following portion of his closing argument:

. . . And you've heard the testimony and you know what these damages that we're looking for are. The main one that you've heard testimony about is the $189,336.61 that was paid—actually paid out-of-pocket to the State of North Carolina to get rid of this tax assessment that was such an immaterial, insignificant thing.

. . . .

In addition to that you heard Mr. Hardin's [sic] testimony that the refunds during just the last calendar year were $107,000 and we can't get those refunds ever again without knowingly and intentionally breaking the law. And so that's $107,000 a year that impacts the value of this company that they sold us without telling us that.

Mr. Heddelman talked about a multiple that they used in calculating the purchase price of approximately six. Mr.

Wagner told you that that was a reasonable multiple; it's half what you would pay for a publicly-traded company. If you take a multiple of six times $107,000, that's a $642,000 loss in the value of this company. If you add the 642,000 to the 189,000 already paid to the State, the amount of damages that was then incurred by Wrangler as a result of the breach of warranty and the fraud is $831,336.61. So that's . . . the "so what" in this case.

Now, if you return a verdict on both the compensatory— on both the breach of contract claim and the fraud claim for $831,336, you still have the question before you of do you award punitive damages in this case. . . .

Under these circumstances, there can be no doubt that the amount entered on 2.a. was intended to compensate appellee for that very same amount of taxes it had paid to North Carolina, and that the amount entered on 5.a. compensated appellee for the fact that an annual tax refund of $107,000 was no longer available. Appellee has not received a "double recovery."

## IV

According to appellants, there are four reasons why the punitive damage award must be reversed: (1) because the trial court misconstrued the actual malice requirement, the evidence was insufficient for the jury to consider an award of punitive damages; (2) the jury instructions failed to meet applicable legal standards; (3) the trial court failed to conduct a proper post-verdict review; and (4) the verdict is unconstitutional and grossly excessive. There is no merit in the first two arguments.

### 1. Sufficiency of the Evidence

In *Ellerin, supra*, the Court of Appeals resolved the issue of whether, in an action for fraud, the plaintiff may recover punitive damages even though there was no evidence that the defendant intended to injure the plaintiff. It is now certain that, in a fraud case, "a person's actual knowledge that his

statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages." *Id.* at 240, 652 A.2d 1117.

■ The *Ellerin* Court explained that our case law recognizes two different mental states that may give rise to fraud: (1) actual knowledge that the representation is false; and (2) reckless indifference to the truth or falsity of the representation. *Id.* at 229–33, 652 A.2d 1117. Although punitive damages cannot be awarded in "reckless disregard" fraud cases,

the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages.

*Id.* at 234, 652 A.2d 1117.

We have already discussed why the jury was entitled to infer that (1) nondisclosure of the field audit report constituted a material misrepresentation; (2) appellants knew they had a duty to disclose the field audit; and (3) appellants intended to deceive appellee by not disclosing that information. The evidence was sufficient to support the conclusion that appellants should be liable for punitive damages.

## 2. Adequacy of Jury Instructions

The verdicts at issue in this case were returned on the second day of deliberations. The parties agreed that the jury should first decide the issues of warranty, fraud, and compensatory damages, as well as the issue of whether some amount of punitive damages should be considered. The parties also agreed that, if the jury (1) awarded compensatory damages for fraud, and (2) concluded that appellants were liable for punitive damages, there would be a second, separate deliberation to determine the amount of damages, preceded by additional instructions and argument of counsel. Before the final arguments that preceded the first deliberations, Judge Angeletti gave the following instructions on punitive damages:

As you know, the Court has already told you in the explanation of the verdict sheet that you may award punitive damages if you are persuaded by clear and convincing evidence that the plaintiff has established that either or both defendants are liable for punitive damages.

If you find the defendants are guilty of fraudulent conduct, that is, that they had actual knowledge that the statement was false and the defendant [sic] intended to deceive the plaintiff by means of that false statement, then you may find that they are liable for punitive damages.

Now, punitive damages, in Maryland, may be imposed only where there is outrageous or egregious conduct. It may be awarded only upon a showing of actual malice or intentional fraud. It's to punish the wrongdoer, to teach them not to repeat their wrongful conduct, and to deter others from engaging in the same conduct.

It must relate to the degree of culpability exhibited by the particular defendant and other instructions which, if you find that there is a liability for punitive damages, I will instruct you on as [sic] to calculate the amounts at a later time.

Now, punitive damages should only be awarded if you find actual malice that [sic] exists in this case. That means that you must determine whether these defendants, Blue Bell and VF Corporation, acted with an evil motive, ill-will, and a deliberate desire and intent to harm the plaintiff.

This means that there must be an evil or rancorous motive influenced by hate for which there is no explanation. An evil action has no belief or proper purpose and is one that the defendants cannot explain as having thought they pursued for a proper purpose. The primary purpose of the defendants for the action must be to deliberately and wilfully injure the plaintiff.

The claim of conduct alluded to by the plaintiff must be examined by you to determine if, in your judgment, there is clear and convincing evidence that the actions taken by these defendants, not volunteering the results of the sales

and use tax audit, was without any proper justification. The sole motive must have been to injure the plaintiff and not merely to benefit itself.

You may determine that the plaintiff is entitled to punitive damages only if you conclude that there is sufficient clear and convincing evidence that this action was motivated by such ill-feelings against the plaintiff. The availability of punitive damages, therefore, depends on the reprehensibility of the defendants', Blue Bell and VF's, conduct in this case.

When a person makes a false statement of fact about property and that statement may reasonably be expected to affect the value of that property, they are responsible for any financial loss which may result. The plaintiff must prove that the defendant was motivated by ill-will, or made the statement with knowledge of its falsity, or reckless disregard of its truth.

Both sides took exception to these instructions. Upon consideration of counsel's exceptions, Judge Angeletti concluded that he should have defined "material" fact, and should not have stated that "deliberate intent to harm" is required in a fraud action. He also decided to make it clear that punitive damages could not be awarded for a fraudulent misrepresentation based on reckless disregard of the truth.[4] He commendably delivered the following instructions on those issues:

... A fact is material if, under the circumstances, a reasonable person would rely upon it in making their decision. A fact may also be material, even though a reasonable person might not regard it as important, if the person stating or concealing it knows that the person with whom they are dealing probably will use the fact in determining their course of conduct.

---

4. This case contains an excellent example of how Rule 2–520(e) is supposed to work in complex litigation. The trial judge listens patiently as counsel explain their exceptions and, when there is merit in an exception, the jurors are reinstructed properly before closing arguments begin.

You were given some instructions as to punitive damages. In a fraudulent conduct case such as is charged in this case, if you find that the defendants are guilty of fraudulent conduct, then you may award punitive damages, in addition to the amount of compensatory damages you find the plaintiff is entitled to, if you find that the defendant had actual knowledge that its statement was false and the defendant intended to deceive the plaintiff by means of that false statement.

That re-instruction was entirely correct. On the second day of deliberations, before it returned its compensatory damage verdicts, the jury requested clarification of the punitive damages instruction, and Judge Angeletti responded as follows:

Notwithstanding any other instructions previously given, if you find that the defendants, or either of them, are guilty of fraud, you may award punitive damages in addition to the amount of compensatory damages you find the plaintiff is entitled to, the amount to be determined only if you find that the standards relating to punitive damages are met, if you find that the defendant had actual knowledge that its statement was false and the defendant intended to deceive the plaintiff by means of a false statement.

That instruction was also correct. Later that day, before the second phase of deliberations, Judge Angeletti delivered the following instruction:

Now, members of the jury, in this phase of the case, you will have before you the evidence relating to the financial condition of [appellants], and that information is before you for purposes of assisting you in trying to determine what amount, if any, of punitive damages to assess in favor of Wrexham, the plaintiff herein, as a result of this occurrence.

All of the previous general instructions the Court has given you are in effect relating to all of the evidence....

In determining the amount of [the punitive damages] award, you should use your sound judgment and discretion to arrive at an amount which you believe will punish the defendant and deter the defendant and others from similar

conduct. There should be a reasonable connection between the award and the defendant's ability to pay. The award should not be designed to bankrupt or financially destroy the defendants.

Appellants' counsel noted an exception to these instructions, stating:

> To the extent that the Court has advised the jury that it may consider the relationship between the amount of damages awarded as compensatory damages and determining punitive damages, I take exception to the failure of the Court to instruct the jury as to that and as to the fact that this was a one-time incident in a business transaction, no physical injury to anyone, no life-threatening situation, no fiduciary duty existed between the parties in this arm's length transaction.

> I think that all of those are factors which the Court should advise the jury they may consider in determining punitive damages and the amount of punitive damages, and to the extent that the Court has not given those factors to the jury, I take exception.

According to the appellants, these instructions are deficient because they (1) are inconsistent, (2) improperly emphasize appellants' ability to pay and minimize their culpability as factors for the jury to consider in determining the amount of the punitive damages award, and (3) do not refer to mitigating factors. There is no merit in any of those contentions.

■■■ We do not agree that these instructions were inconsistent. That argument can be made whenever the trial judge finds it necessary to retract an incorrect instruction and replace it with a correct one. Moreover, it was appellants who pressed for the incorrect "actual malice" language that was properly retracted after the exceptions conference. The instructions, when taken as a whole, are entirely consistent with the law set forth in *Alexander & Alexander v. B. Dixon Evander & Associates, Inc.*, 88 Md.App. 672, 715–716, 596 A.2d 687 (1991), *cert. den.*, 326 Md. 435, 605 A.2d 137 (1992),

and *Ellerin,* as well as with the revisions to MPJI 10:12 and 10:12.1.

�as Appellants contend that the jurors should have been instructed that "any amount of punitive damages awarded must bear a reasonable relationship to the economic injury in this case." It is true that the jurors did not hear those very words.[5] We are persuaded, however, that there are four reasons why appellants are not entitled to a reversal on this ground.[6]

First, appellants' written request for that precise instruction was buried near the bottom of the first page of Appellants' Requested Instruction No. 25, a two page request for fact-

---

**5.** Neither Judge Angeletti nor counsel had the benefit of the April 1996 revision to the Maryland Pattern Jury Instructions—Civil (1996) ("MPJI"). MPJI 10:12 now recommends the following instruction on punitive damages generally:

> If you find for the plaintiff and award damages to compensate for the injuries (losses) suffered, you may go on to consider whether to make an award for punitive damages. An award of punitive damages must be proven by clear and convincing evidence.
>
> An award for punitive damages should be in an amount that will deter the defendant and others from similar conduct. An award of punitive damages should be proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay but not designed to bankrupt or financially destroy a defendant.

MPJI 10:12.1 now recommends that, in a fraud case, the jurors be instructed:

> An award of punitive damages in this case requires that the defendant acted with a certain state of mind. If you find that the defendant actually knew the representation was false and expected the plaintiff to rely upon the representation, you may make an award for punitive damages. While an award for compensatory damages may be based upon a finding that the defendant made a representation with reckless indifference to its truth, this is not sufficient to warrant the award of punitive damages. Negligence, however gross, is not enough to award punitive damages. The defendant's knowledge of the falsity of the representation is the state of mind that justifies the award of punitive damages.

**6.** Neither our rejection of this contention nor anything else in the opinion should be interpreted as a criticism of appellants' trial counsel. Indeed, we are favorably impressed with the work of all counsel of record in this case. The verdicts at issue in this appeal reflected the jury's assessment of appellants' conduct, and were not aggravated in any way by the able lawyers who represented appellants at trial.

specific, argumentative instructions to which appellants were not entitled.[7] We shall not reverse a trial judge's failure to find a needle in a haystack. Second, the proposed instruction was incomplete because it did not include the proposition that the jurors are entitled to consider the potential harm as well as the actual harm. *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 2721–22, 125 L.Ed.2d 366 (1993); *BMW of North America, Inc. v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1603, 134 L.Ed.2d 809 (1996). Third, the above quoted exception merely requested that the court tell the jurors that they "may consider" such a relationship. Finally, because appellants' trial counsel "could, and did, present the very arguments to the jury that [he] would have made had [the requested] instructions been given, the matter was fairly, and adequately, covered in the instructions actually given." *CSX Transportation, Inc. v. Continental Ins. Co.,* 343 Md. 216, 243, 680 A.2d 1082 (1996).

The jurors were instructed that their award "must relate to the degree of culpability exhibited" by the defendant, and thereafter heard the following argument from appellants' counsel:

> ... [B]ut VF did not sell to the consumer public a dangerous drug or a dangerous product that would hurt people. There was no physical injury that anybody sustained as a result of what was done.
>
> There was no fiduciary relationship between VF or Frank Picard [sic] and the plaintiff in this case. The plaintiff in this case and my client—at arm's length, represented by counsel, in a sophisticated business transaction, and so average people were not hurt. And you've already determined the amount of injury that you believe has occurred and you are, in effect, telling us that we were wrong in what

---

7. Appellants submitted forty-one written Requests for Jury Instructions.

we did and that we should give that money back to Wrexham.

. . . .

So I'm asking you to keep in mind when you make your decision who is involved, what was involved, the size of the transaction, and the amount of injury that you have determined by your verdict is appropriate.

The jury ultimately calculated its compensatory damage award down to the penny and its punitive damage award down to thirty dollars. Under these circumstances, we decline to hypothesize that its award could be reasonably related to appellants' "degree of culpability" without also being reasonably related to appellee's compensatory damages.

■ Appellants argue that the trial court committed reversible error when it failed to instruct the jury that it should consider specific mitigating factors such as reliance on the advice of counsel, absence of prior or subsequent similar acts, and the commercial nature of the wrong. The trial judge is not required to summarize the evidence or to deliver the functional equivalent of a party's closing argument. Appellants were entitled to, and did, bring these factors to the attention of the jury. Appellants were not, however, entitled to the jury instruction that they requested.

■ The jurors were instructed that punitive damages (1) require proof by clear and convincing evidence; (2) cannot be awarded unless there was an award of compensatory damages; (3) need not be awarded even though compensatory damages are awarded; (4) must relate to the degree of culpability exhibited by the defendant; (5) may be imposed only upon a showing that appellants had actual knowledge that their misrepresentation was fraudulent; (6) must serve the goals of punishment and deterrence; and (7) must not bankrupt or financially destroy appellants. Those correct and comprehensive instructions satisfied the special prerequisites for a puni-

tive damage award in a fraud case.[8] *Alexander,* 88 Md.App. at 715–16, 596 A.2d 687; *Ellerin,* 337 Md. at 234, 652 A.2d 1117.

### 3. *Post-Verdict Review by the Trial Judge*

### &

### 4. *Post-Judgment Appellate Review*

A punitive damage award that was entered upon proper procedure may nonetheless violate the Due Process Clause of the Fourteenth Amendment. *Alexander,* 88 Md.App. at 719, 596 A.2d 687. Review of the amount of the award, first by the trial court and then by an appellate court, is an essential safeguard against that danger. *Haslip, supra,* 499 U.S. at 22, 111 S.Ct. at 1045–46 (1991).

In *Haslip,* while affirming a punitive damage judgment that was "more than 200 times the [plaintiff's] out-of-pocket expenses," *id.* at 23, 111 S.Ct. at 1046, the Supreme Court identified three essential components of "the constitutional calculus" involved in its decision: (1) the jury instructions were correct; (2) there was an effective judicial review of the verdict; and (3) the amount of the award did not lack objective criteria. *Id.* at 18–21, 111 S.Ct. at 1043–45. In *BMW,* filed on May 20, 1996, the Supreme Court identified three additional "guideposts" to a correct due process analysis.

In its required post-verdict review of a punitive damage award, the circuit court must state its reasons for interfering with the jury verdict, or for refusing to do so.[9] In our

---

**8.** Because of their business structure, appellants agreed that the jury should not be given the "individual basis" instruction that is required when punitive damages are being sought against more than one defendant.

**9.** The reviewing court will often be required to address the question of whether (or the extent to which) the defendant has been punished in one state for conduct that occurred in other states, as well as the question of what impact the punitive award would have on innocent third parties who may be unable to collect compensatory damages because of punitive damages awarded to the plaintiff(s) who won the

independent post-judgment review, the appellate court must determine whether the special prerequisites for a punitive damage award have been satisfied; i.e., whether the evidence was sufficient to support an award of punitive damages, whether the jury was instructed properly, and whether the trial court's post-verdict review contained any erroneous finding of fact, any error of law, or any abuse of discretion.

Judge Angeletti's post-trial *Memorandum Opinion* contains no erroneous finding of fact. Over eight months after that opinion was filed, however, *BMW* changed the applicable law. That change requires a new post-verdict review by the circuit court.

### *BMW v. Gore*

*BMW* involved a fraud action filed in the Circuit Court for Jefferson County, Alabama, by the purchaser of a BMW sports sedan who had not been told by BMW that the "new" car for which he paid nearly $41,000.00 had been damaged in transit and repainted before delivery. BMW defended the claim on the ground that nondisclosure to the plaintiff was entirely consistent with its "nationwide policy" that, unless the cost of repair exceeded 3 percent of the new car's retail price, the repaired car was delivered as "new" without disclosure of the defect. According to BMW, because the repair cost at issue was only 1.5 percent of the retail price, no disclosure of the damage or repair was required.

The jurors heard an expert witness opine that repainting the type of luxury vehicle involved in this case would reduce its market value by 10%. The jurors were also presented with evidence that, since BMW's 3% policy had gone into effect, it had sold as "new" a total of 983 cars that had been repainted at a cost of more than $300 per car. Although only 14 such

---

race to the courthouse. In this case, however, there is no danger that a Maryland jury has punished appellants for fraud committed on some other occasion or in some other state, and there is no danger that even one other plaintiff has a right to collect damages for the fraud involved in the transaction at issue.

vehicles had been sold in Alabama, plaintiff's counsel argued that the punitive damage award should be calculated by multiplying the amount of the plaintiff's compensatory damages by the approximate number of vehicles that should not have been delivered as new ($4,000 × 1,000).

The jurors agreed with that argument, finding BMW liable for compensatory damages of $4,000 and punitive damages of $4 million dollars. The Supreme Court of Alabama concluded that the punitive damage award was too high because the jury punished BMW for conduct that occurred in jurisdictions other than Alabama. That court reduced the punitive damage award to $2 million dollars. *BMW of North America, Inc. v. Gore*, 646 So.2d 619, 621 (Ala.1994). Although the United States Supreme Court was unanimous in its conclusion that some amount of punitive damages would not be unconstitutional in this case, a majority held that the $2 million dollar award was "grossly excessive." According to Mr. Justice Stevens,

> (e)lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose. Three guideposts, each of which indicates that BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose for adhering to the nondisclosure policy adopted in 1983, lead us to the conclusion that the $2 million award is grossly excessive....

*BMW,* —— U.S. at ——, 116 S.Ct. at 1598 (footnote omitted).

■ If the only constitutional violation identified in *BMW* was the lack of "adequate notice of the magnitude of the sanction that [the state] might impose," that case would have no application to this one, in which it is certain that appellants were on notice that they could very well be hit with a forty million dollar punitive damage award. As Judge Angeletti pointed out in his Opinion:

> It was entirely predictable that if the jury rejected [appellants'] arguments on materiality, those same arguments

would be used against [them] to produce very large numbers on a pro rata basis.

We are persuaded, however, that *BMW*'s guideposts are applicable even when the defendant has adequate notice of the amount at issue. The reviewing court is now required to (1) consider the "degree of reprehensibility of [appellants'] conduct," *id.*, at ——, 116 S.Ct. at 1599, (2) determine the ratio between the harm (or potential harm) suffered by the victim and the amount of punitive damages awarded therefor, *id.* at —— – ——, 116 S.Ct. at 1601–02, and (3) compare the difference between the amount awarded and "the civil or criminal penalties that could be imposed for comparable misconduct." *Id.* at ——, 116 S.Ct. at 1603.

■■■ This court must, of course, apply *BMW* to the judgment at issue. The question is whether we should apply the guideposts at this point in our post-judgment review, or remand for a post-verdict review by the circuit court. The answer to that question is found in *Haslip*. Because post-verdict review by the trial judge is an essential prerequisite to a valid punitive award, we conclude that the *BMW* guideposts should first be applied by the circuit court. This conclusion is bolstered by *Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991), in which the appellate court remanded a pre*Haslip* punitive damage award to the United States District Court for the Western District of Arkansas so the trial judge could "review the award under the criteria approved in *Haslip*..." *Id.* at 1347. On remand, the circuit court shall apply each of the following standards to the punitive award at issue.

### Degree of Reprehensibility

The reprehensibility analysis is required by the principle "that punitive damages may not be 'grossly out of proportion to the severity of the offense.'" *Id.*, at ——, 116 S.Ct. at 1599 (quoting *TXO*, 509 U.S. at 453, 113 S.Ct. at 2717–18 (1993)). In other words, the punishment should fit the crime. *BMW*, —— U.S. at —— n. 24, 116 S.Ct. at 1599 n. 24.

We agree with appellants that violent acts and acts that reveal a reckless disregard for public safety are generally more reprehensible than acts that do not result in physical harm. *Id.* at ——, 116 S.Ct. at 1599. Deceit, however, is certainly reprehensible. *Id.* at ——, 116 S.Ct. at 1599. And, when "the infliction of economic injury [resulted from] affirmative acts of misconduct, . . . a substantial penalty [is warranted]." *Id.* at ——, 116 S.Ct. at 1599.

This is a case in which a punitive award is appropriate. The precise question is, however; "does the punishment fit the crime?"

### *Ratio to Compensatory Damages*

Punitive damages "must bear a 'reasonable relationship' to compensatory damages. . . ." *Id.* at ——, 116 S.Ct. at 1601. That requirement had been rejected by the Court of Appeals in *D.C. Transit System Inc. v. Brooks,* 264 Md. 578, 589–90, 287 A.2d 251 (1972). It is now clear, however, that the reviewing court must apply a "reasonable relationship" test.

Punitive damage awards are less likely to be arbitrary when the argument as to the amount of such damages is based on a fact-specific economic theory that establishes a reasonable relationship between the harm (or potential harm) caused by the defendant and the goals of punishment and deterrence. *BMW,* —— U.S. at ——, 116 S.Ct. at 1607 (Breyer, J., concurring). We agree with Justice Breyer that a valid economic theory may well explain what would otherwise appear to be an exorbitant punitive damages award, and a more deferential appellate review is appropriate when the jury has been presented with such a theory. *Id.* at ——, 116 S.Ct. at 1607.

During the punitive damages phase of the present case, appellee's trial counsel asked for an award of "40 million dollars" in punitive damages and supported that request with an economic theory that reasonably related the harm suffered by appellee to the amount of damages that the jury eventually awarded:

> . . . [T]here is no specific number that I can tell you to look at, but I think that you should essentially hang [Mr. Pick-

ard] with his own testimony and his testimony was "A $350,000 liability? No, that wasn't a significant number, not for a company with 42 million dollars in sales like Wrangler had. No, $350,000 isn't significant to someone with 42 million dollars in sales," and that argument was repeated to you on closing argument.

So it wasn't just something that Mr. [Pickard] blurted out. You'll recall this work sheet emphasizing 42 million in sales, and if you try to figure out how much $350,000 is in relation to 42 million in sales, well, gosh, it's only eight-tenths of one percent. It's less than one percent and so that can't be an import [sic] number, can it?

 . . . .

And if you use his own percentage of eight-tenths of one percent of our last year's sales, you're talking about 40 million dollars, and even then you have to ask yourself, "Well, but Mr. Picard [sic] testified that that's not a significant number. He said that that percentage was not significant."

 . . . .

. . . 40 million dollars would be just about 15 percent of [VF's] last year's . . . after-tax profit.

And you'll recall this $350,000 liability that they didn't want to disclose was about 15 percent of the purchase price for the stock of Wrangler Aviation. So there is another relationship there. If you take the 40 million dollar number, it does tie in directly to Mr. Picard's testimony about what is not material an it ties in directly to the relationship with the purchase price for Wrangler Aviation.

 . . . .

In fact, if you think back, they brought in this expert testimony from Mr. Borris. Gunther Borris, and Mr. Borris said something like, "Well, $350,000 is not significant because, if the company already had liabilities of 21 million, so what if it has liabilities of $21,350,000? So, no, 350,000 isn't significant."

So that's the thinking. Again, these big numbers, if that's what they say is not significant, then you have to pick a high enough number to get their attention and to make them appreciate the wrongfulness of their conduct in this case.

That argument was much more logical and fact-specific than the argument presented in *BMW*.[10] Appellee's counsel was certainly entitled to argue that the punitive damages award should bear some reasonable relationship to VF's (1) sales and (2) net profits.[11] Judge Angeletti's *Memorandum Opinion* includes the following observations:

Addressing the question of what amount of liability should be considered material in a commercial setting, the corporate treasurer of VF testified that $325,000 would not be a material liability for a company with $42,000,000 in sales.... In other words, under the VF standard of materiality, an amount equal to that small percentage (.008333,— i.e., less than 1%) of a company's sales would not be considered material by VF. Applying this standard to VF's own operations proportionately, a liability of $41,429,284 (i.e., .008333 × Defendants' sales of $4,971,713,000) might not be considered significant or material by VF.

The jury's award was approximately half that amount, and closely approximates the same percentage of VF's sales that $189,000 (the taxes ultimately paid by Wrangler) represented in relationship to Wrangler's $42 million in sales....

....

The Defendant's accounting expert, Mr. Gunther Borris, expressed the opinion that a $350,000 liability would not be

---

**10.** The United States "Constitution does not require the States to subscribe to any particular economic theory" when reviewing an award of punitive damages. *Browning–Ferris Ind. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 300, 109 S.Ct. 2909, 2933, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part) (quoting *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987)).

**11.** In post-trial proceedings before Judge Angeletti, appellants characterized this as an unfair and misleading "tit for tat" argument. They interposed no objection, however, when it was made to the jury.

material to a company like Wrangler that already had $21 million in other liabilities.... A liability which was "merely" 1.6% of a company's other liabilities would not be material. Applying that standard to VF's liabilities of $1.6 billion, VF would not consider a liability of $25,625,584 material. The jury's award was under that amount.

. . . .

... Defendants [argued to the jury] that a liability which represented 8.75% [$350,000 + $4,000,000 = .0875] of Wrangler's net loss would not be material. Applying this percentage to VF's net operating income of $455,661,00 before taxes and $274,536,000 after taxes, would produce benchmarks of $39.87 million and $24.02 million respectively. Again, the jury's award was proportionately less than the amount the Defendants contended should not be considered material by the Plaintiff and the jury.

The jury could properly consider these proportionate amounts in determining an appropriate amount to punish Defendants for their efforts to transfer to Plaintiff an undisclosed liability for $350,000 in back taxes and a new recurring expense of $107,000 per year.

We do not disagree with that analysis. There is, however, a distinction between (1) a logical explanation for the jury's verdict, and (2) the constitutional requirement that there be a reasonable relationship between the compensatory and punitive damages. It is for the circuit court in the first instance to determine whether the punitive award in this case bears a constitutionally reasonable relationship to the compensatory damages.

### Sanctions for Comparable Misconduct

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW,* —— U.S. at ——, 116 S.Ct. at 1603. Md. Ann.Code art. 27, § 174 (1992 Repl.Vol.) provides as follows:

Any officer or agent whatsoever of any corporation who shall fraudulently sign, or in any other manner assent to

any statement or publication, either for the public or the shareholders thereof, containing untruthful representations of its affairs, assets or liabilities with a view either to enhance or depress the market value of the shares therein, or the value of its corporate obligations, or in any other manner to accomplish any fraud thereby, shall be deemed guilty of a misdemeanor, and upon conviction thereof, by indictment in any court of law, shall be fined not less than one thousand dollars nor more than ten thousand dollars, and be imprisoned in jail or penitentiary, or either fined or imprisoned, at the discretion of the court, for not less than six months nor more than three years.

The maximum fine is not much of a benchmark when imprisonment "could also be required of an individual in the criminal context." *Haslip*, 499 U.S. at 23–24, 111 S.Ct. at 1046. The maximum jail sentence, however, reflects the legislature's judgment that corporate misrepresentation is a serious offense. In *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), the Court of Appeals quoted with approval the following observation in *Goddard v. Grand Trunk Ry.*, 57 Me. 202, 223–24 (1869):

We confess that it seems to us that there is no class of cases where the doctrine of exemplary damages can be more beneficially applied then to ... corporations.... A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands.... Neither guilt, malice, nor suffering is predicable of this ideal existence, called a corporation.... And since these ideal existences can neither be hung, imprisoned, whipped, or put in the stocks,— since in fact no corrective influence can be brought to bear upon them except that of pecuniary loss,—it does seem to us that the doctrine of exemplary damages is more beneficial in

its application to them, than in its application to natural persons.

*Id.* at 137, 442 A.2d 966. The *Ellerin* Court suggested that the reviewing court consider the legislative policy reflected in criminal statutes that are applicable to the conduct at issue. *Ellerin,* 337 Md. at 242 n. 13, 652 A.2d 1117. That suggested analysis has been made mandatory by *BMW.*

## Conclusion

On remand, the circuit court shall determine whether the punitive damage award in this case satisfied the requirements of both *Haslip* and *BMW.* If persuaded that the award does not comport with due process, the court has discretion to order a remittitur or a new trial. The parties will thereafter have a right to further post-judgment appellate review of the final punitive damages judgment entered by the circuit court.

We conclude by addressing a concern expressed during oral argument, when appellants' counsel suggested that an affirmance of the punitive award in this case might be viewed as an indication that Maryland is an "anti-business" state. As we said on that occasion, (1) because judges should be influenced by no interest other than the interest of justice, if corporate America does perceive Maryland to be "anti-business," it is not for the judicial branch of government to change that perception; and (2) it is unfair to suggest that our trial or appellate courts are somehow unfriendly to business interests.[12] There is, however, a decidedly "pro-business" message in this opinion: because claims of business fraud receive full and fair adjudication in our courts, this state is not a safe harbor for those who would defraud others, and it is therefore unlikely that corporations will be victimized by fraud while transacting business in Maryland.

---

**12.** Subsequent to oral argument in this case, the Court of Appeals was criticized, unfairly so we think, for its refusal to hold "that punitive damages are recoverable in an action for fraud, regardless of which form of knowledge supports the finding of fraud." Survey, *Recent Decisions of The Maryland Court of Appeals,* 55 Md. L.Rev. 529, 806 (1996).

JUDGMENTS FOR COMPENSATORY DAMAGES AF-
FIRMED; JUDGMENT FOR PUNITIVE DAMAGES VA-
CATED; CASE REMANDED FOR A POST–VERDICT
REVIEW OF PUNITIVE DAMAGE AWARD; APPEL-
LANTS TO PAY 50% OF THE COSTS; 50% OF THE
COSTS TO BE PAID BY APPELLEE.

GETTY, J., concurs.

GETTY, Judge, concurring.

I concur in the remand allowing the trial court to reconsider
the issue of punitive damages in accordance with the due
process standards articulated in *BMW v. Gore*, which was
decided by the Supreme Court subsequent to the trial court's
affirmance of the punitive damage award in this case. Absent
the remand, I would reverse and grant a new trial as to the
punitive damage award which, in my view, was grossly exces-
sive.